THE PRESTON NATIONAL BANK OF DETROIT v. THE
GEORGE T. SMITH MIDDLINGS PURIFIER COM-
PANY ET AL.

*Corporations—Authority of officers—Assignment of open accounts
as security—Necessity of filing—Equity—Enforcement
of contract.*

1. How. Stat. § 6193, providing for the filing of chattel mortgages, applies only to mortgages of goods and chattels which are capable of delivery, and not to an assignment of open accounts.

2. The by-laws of a corporation provided that one person might hold the offices of president, treasurer, and general superintendent, and vested in the president the general supervision of the property and affairs of the corporation, and in the treasurer the custody of its funds and valuable papers, with power to collect and pay out all moneys and sign all acceptances and notes in its behalf, while the superintendent was given general supervision and management of its affairs, subject to the president and board of directors, with power to make all contracts in its behalf except when otherwise provided by the by-laws. The same person held the three offices for five years, and managed and controlled the affairs of the corporation, if not without advice, certainly without objection, on the part of the stockholders or directors, and finally assigned to a bank, to secure existing indebtedness and that which should be thereafter incurred, $150,000 of good and collectible accounts, then existing or thereafter acquired, to be held by the bank as collateral security for existing and future indebtedness of the corporation. The corporation made an assignment for the benefit of its creditors, and the bank filed a bill to enforce the agreement, which is held to have been one which the president, treasurer, and superintendent had the power to make, and to be enforcible by a court of equity.

Appeal from Wayne.    (Hosmer, J.)    Argued November
19, 1890.    Decided December 24, 1890.

Bill to enforce the assignment of certain accounts.

Defendants Emerson and Eldred appeal. Decree affirmed. The facts are stated in the opinion.

*Julian G. Dickinson,* for complainant, contended:

1. The agreement operated as a delivery of such of the accounts as remain in existence, and which the court can reach by the remedy it affords to the complainant in this case; citing 3 Pom. Eq. Jur. §§ 1297, 1402, and cases cited in notes.

2. The defendant having refused and neglected to set aside the good and collectible accounts on the demand of the complainant, equity will enforce the agreement, and decree that such accounts, and the moneys and bills receivable derived therefrom, and in the hands of the defendant receivers, shall be held for the payment of the indebtedness due complainant; citing 3 Pom. Eq. Jur. §§ 1234, 1235; *Tailby v. Receiver,* 13 App. Cas. 523.

3. By the agreement the intent appears to be to assign to complainant the good and collectible accounts, which the corporation agreed to set aside as specified; therefore the agreement constitutes an equitable lien on the accounts existing or thereafter acquired in the conduct of the business of the corporation, which a court of equity will enforce; citing Pom. Eq. Jur. §§ 166, 167, 1234–1237; *Burgon v. Cabanne,* 42 Minn. 267; *Brown v. Munger,* Id. 482.

4. An assignment of demands having no actual existence, though invalid at law, may be valid in equity as an agreement, and take effect as an assignment when the demands intended are subsequently brought into existence; citing *Kane v. Clough,* 36 Mich. 440; *Field v. Mayor,* 6 N. Y. 179; *Williams v. Ingersoll,* 89 Id. 508; *Mitchell v. Winslow,* 2 Story, 630, 638; 1 Pom. Eq. Jur. § 167.

5. Under the evidence, the non-delivery of the statements of the accounts on the books of the corporation, or copies therefrom, would be of no legal consequence accompanying this agreement. In the absence of an express agreement assigning the rights of action in controversy, a delivery of the books of account, or statements of the accounts from the books, doubtless would be evidence of the transfer of the accounts, and would tend to show the intent to transfer the rights of action; citing *Green v. Langdon,* 28 Mich. 221; *Ellis v. Secor,* 31 Id. 185; *Parsell v. Thayer,* 39 Id. 467; *Love v. Francis,* 63 Id. 181.

6. The assignor was bound not to reassert the rights of action, and is estopped by its own grant. The notice to the defendants Emerson and Eldred of the assignment to complainant is equiv-

alent to taking possession of the fund, and they thereupon became trustees for the complainant of the choses in action; citing *Green v. Langdon*, 28 Mich. 221; *Draper v. Fletcher*, 26 Id. 154; *Ellis v. Secor*, 31 Id. 185; *Love v. Francis*, 63 Id. 181; *Brown v. Brabb*, 67 Id. 17; *Fuller v. Rhodes*, 78 Id. 36; *Sperry v. Clarke*, 76 Iowa, 503; *Greentree v. Rosenstock*, 61 N. Y. 583; *Freund v. Bank*, 76 Id. 352; *Whittle v. Skinner*, 23 Vt. 536; *White v. Kilgore*, 77 Me. 571; *Tingle v. Fisher*, 20 W. Va. 497.

7. The property intended to be set aside by the agreement is sufficiently described to render it capable of identification. The instrument indicates and directs where and what are the accounts, and from what source the future accounts were to be derived; and the undisputed facts in evidence show no difficulty of identification. The rule applicable to such agreements is that the description is sufficient if it is capable of being made certain by inquiries which the instrument indicates or directs, or by extrinsic evidence. It is not necessary that the description should be so explicit and exclusive as to supersede recourse to extrinsic proof; citing *Giddey v. Uhl*, 27 Mich. 94; *Ellis v. Secor*, 31 Id. 185; *Willey v. Snyder*, 34 Id. 60; *People v. Bristol*, 35 Id. 28; *Haskell v. Ayres*, Id. 89; *Austin v. French*, 36 Id. 199; *Sexton v. McDowd*, 38 Id. 148; *Fordyce v. Neal*, 40 Id. 705; *Howard v. Bellows*, 49 Id. 620; *DeGraff v. Byles*, 63 Id. 25; *Wade v. Strachan*, 71 Id. 459.

8. The assignees (receivers) can assert against the complainant, in behalf of the general creditors, no claim to the property which the assignor could not have asserted; citing *Brown v. Brabb*, 67 Mich. 17; *Root v. Potter*, 59 Id. 498; *DeGraff v. Byles*, 63 Id. 25; *Jones v. Graham*, 77 N. Y. 628; *Watson v. Pugh*, 51 Ark. 218.

*Marston, Cowles & Jerome,* of counsel for complainant, contended:

1. This assignment was for security only; it was in the nature of a chattel mortgage upon the accounts then existing, or that should thereafter accrue or be acquired in the conduct of the business of the assignor, the debtor; and a mortgage upon after-acquired goods is valid; citing *Robson v. Railroad Co.*, 37 Mich. 70; *Cadwell v. Pray*, 41 Id. 307; *Curtis v. Wilcox*, 49 Id. 425; and accounts in existence may be assigned either absolutely or as security; citing *Kane v. Clough*, 36 Mich. 436; *Neumann v. Mining Co.*, 57 Id. 97; and so may accounts not in existence, but arising upon contracts which were in existence, at the time of the assignment.

2. But even admitting that, as to the whole or any part of the accounts, there should be doubts as to the assignment being good in law, yet we assert that an assignment of demands having no actual existence, though invalid in law, may be valid in equity as an agreement, and take effect as an assignment when the demands intended are subsequently brought into existence, and the assignee in such a case would have a right to protect his interests in the accounts in a court of equity; citing *Kane v. Clough*, 36 Mich. 436, 440; *Field v. Mayor*, 6 N. Y. 179; *Mitchell v. Winslow*, 2 Story, 630, 638.

3. The assignment was valid, although but a part of a large amount was assigned, and there was no selection or setting apart of any particular accounts; citing *Haskell v. Ayres*, 35 Mich. 89; *Grant v. Bank*, Id. 515; *Iron Cliffs Co. v. Buhl*, 42 Id. 86; *Carpenter v. Graham*, Id. 191; *Howard v. Bellows*, 49 Id. 620; *Wagar v. Railroad Co.*, 79 Id. 648; and this Court has declined to follow the authorities holding a contrary doctrine, and collected in Benj. Sales, § 398 (note).

4. But, there being at no time more than $110,000 of good and collectible accounts, the assignment was of *all the good and collectible accounts*, which words the court may be called upon to define, but, when once given a meaning or construction, no more difficulty can be experienced than in determining whether a particular board is a cull or a common,—nor so much, as the fact of payment, either voluntary or by suit, would determine the question to an absolute certainty; and this could be done by a receiver appointed to take and collect the accounts.

5. As to equitable assignments, and the rights of the assignee thereunder, counsel cited 1 Pom. Eq. Jur. §§ 167–169; *Field v. Mayor*, 6 N. Y. 179; *Kane v. Clough*, 36 Mich. 440; *Peugh v. Porter*, 112 U. S. 742; *James v. Newton*, 142 Mass. 377; *Gallinger v. Pomeroy*, 3 G. Greene, 178.

6. No delivery of the accounts was necessary, a delivery of the memorandum of transfer being sufficient; citing *Ellis v. Secor*, 31 Mich. 189; and the parties might make the assignment as they chose, so long as no one else was injured or defrauded; citing *Herbstreit v. Beckwith*, 35 Mich. 94, 95.

*John D. Conely,* of counsel for complainant, contended:

1. In favor of the following propositions of law concerning Smith's authority to make the paper:

*a*—Corporations like the George T. Smith Middlings Purifier Company are private commercial enterprises, notwithstanding their form of organization. Form of corporate organization is permitted to them mainly to enable the stockholders to avoid

the individual liability for debts to which they would be exposed if not so organized.

*b*—In the appointment of agents, and in the implications of authority that result from action and non-action of stockholders and directors, and from the general conduct of their business, active and permissive, they are governed by the same rules and the same inferences that exist as to natural persons.

*c*—Private trading corporations have the right to borrow money to carry on their business, and to give security therefor in any manner not prohibited by law; the rule with them being the same as with natural persons.

*d*—Private trading corporations have the power to dispose of their commercial assets by mortgage or other security for any debt which they may lawfully create, to the same extent as natural persons.

*e*—What a natural person may do in dealing with others he may appoint an agent to do. The rule in regard to private trading corporations as to this is the same as with natural persons.

*f*—Private trading corporations have the right to employ or appoint agents and servants for the transaction of their commercial business and affairs to the same extent as natural persons.

*g*—Such employment or appointment need not be in writing, but may be made and proved by parol, the same as with natural persons.

*h*—The authority of an agent or officer of a private trading corporation may be express, or it may be implied from the conduct, active or permissive, of the corporation, the same as with natural persons.

*i*—The authority of an officer of a private trading corporation does not depend so much on the title of the office as on the duties he is in the habit of performing; the rule of law as to this being the same as with agents of natural persons.

*j*—A person dealing with a private trading corporation is not bound by the specially enumerated powers of the officers of such corporation, but, as against persons so dealing, such officers must be taken to have the authority which their designations imply; and the acts of such officers made within the scope of such implied authority are binding upon the corporation; and such acts are not invalid merely because certain special and enumerated powers, not including the others, are conferred upon such officers by the express terms of the by-laws.

*k*—Such officers must also be deemed to possess the powers which they are permitted by the corporation to exercise, and

their acts as such officers within the scope of the powers so permitted are not invalid merely because certain special and enumerated powers, not including others, are conferred by the express terms of the by-laws.

*l*—The business of obtaining bank accommodations must be regarded, so far as the question of the authority of Smith is concerned, as the ordinary business of the company, and such as he might perform as - president and treasurer of the company without other authority than that shown by the nature of these offices, the language of the by-laws, and the usage of the company; and the power of giving security on the products of the business, whether manufactured goods, open accounts, or bills receivable, is but an incident to the general powers possessed and exercised by him as such president and treasurer.

*m*—A general managing officer of a private trading corporation, be he styled president, treasurer, superintendent, or agent, from the circumstance that he has general charge of the business of the corporation, will possess extensive powers over the products of the business that might not be possessed by an officer of another company holding the same title; the rule of law as to this being the same as with natural persons.

*n*—A private trading corporation has power to borrow money as incident to its power to purchase stock and materials, and, in the absence of any provision to the contrary, the president and treasurer, or other officers, acting unitedly, who make sales, attend to the finances, and who perform the duties of making provision for payment of purchases, have power to give the notes of the company for its obligations, to pledge the products of the business as security for such obligations, and to give the proper and necessary documents to complete such security; the rule of law as to this being the same as where similar executive powers are given to an agent of a private person.

*o*—All the commercial contracts made by an officer of a private trading corporation, within the scope of the commercial business, are good, when he is permitted by the corporation to take its entire and exclusive management; the rule of law as to this being the same as with natural persons.

*p*—Where the authority of an officer of a private trading corporation is left wholly or partly to be inferred by the public from powers usually exercised by such officer, it is enough if the transaction in question involves the same general powers, though applied to a distinct subject-matter; the rule of law as to this being the same as with natural persons.

*q*—A general manager of the business and affairs of a private

84 MICH—24.

trading corporation, in whose hands the entire management of the affairs of the corporation is permitted to be placed, may, without other authority from the board of directors, mortgage the product of the business, or give equivalent security thereon, for the debts of the corporation; the rule of law as to this being the same as with natural persons.

r—A general manager of a private trading corporation, in whose hands the entire management of the affairs of the corporation is permitted to be placed, may, without other authority from the board of directors, assign choses in action, the product of the business, in payment of or as security for its debt; the rule of law as to this being the same as with natural persons.

—Citing, in support of the foregoing, Detroit v. Jackson, 1 Doug. 106; Kimball v. Cleveland, 4 Mich. 606; Joy v. Plank-road Co., 11 Id. 155; Bank v. Hanmer, 14 Id. 208; Mining Co. v. Senter, 26 Id. 73; Fitch v. Hydraulic Co., 44 Id. 74; Star Line v. Van Vliet, 43 Id. 364; Steel Works v. Bresnahan, 60 Id. 332; Lumber Co. v. Williams, 73 Id. 86; Dwight v. Lumber Co., 67 Id. 507; Fay v. Noble, 12 Cush. 1; Bank v. Bank, 48 N. J. Law, 513, 523, 524, 527; Barnes v. Bank, 19 N. Y. 152; Curtis v. Leavitt, 15 Id. 9; Bates v. Bank, 2 Ala. 452; Smith v. Peoria Co., 59 Ill. 412; Smith v. Smith, 62 Id. 493; Mitchell v. Deeds, 43 Id. 416; Allen v. Navigation Co., 22 Cal. 28; Bank v. Bank, 10 Wall. 604; Mining Co. v. Bank, 104 U. S. 192; Martin v. Webb, 110 Id. 7; McKiernan v. Lenzen, 56 Cal. 61.

*Elmer E. Kirkby,* for defendant George T. Smith Middlings Purifier Company.

*Atkinson, Carpenter, Brooke & Haigh,* for defendant George T. Smith.

*Thomas A. Wilson,* for appellants, contended:

1. How. Stat. §§ 4009, 4012, gave to the board of directors of defendant corporation the entire management and control of its business and affairs; citing Star Line v. Van Vliet, 43 Mich. 364; Bank v. Barge Co., 52 Id. 438; and a substantial compliance with the requirements of the statute was essential in order to bind the corporation; and a director, acting singly, cannot impose extraordinary obligations upon it, nor can the manager or officers, unless duly authorized by the board of directors or by-laws; citing Doyle v. Mizner, 42 Mich. 332; Lockwood v. Boom Co., Id. 537.

2. The rule seems to be well settled that where the management

of the affairs of a corporation is, by statute, charter, or by-laws, confided to the board of directors or committee, authority to mortgage or convey the corporate property must emanate from such board or committee, and that the president, secretary, cashier, general manager, or all combined, have no power to mortgage such property, or give equivalent security, though they possess the power to create the indebtedness; citing *Titus v. Railroad Co.*, 37 N. J. Law, 98; *Stokes v. Pottery Co.*, 46 Id. 237; *Luse v. Railway Co.*, 6 Ore. 125; *Leggett v. Banking Co.*, Saxt. Ch. 541; *Coryell v. Bridge Co.*, 9 N. J. Eq. 457; *England v. Dearborn*, 141 Mass. 590; *Fay v. Noble*, 12 Cush. 1; *Smith v. Smith*, 117 Mass. 72; *Carver Co. v. Insurance Co.*, 6 Gray, 214; *Bank v. Trust Co.*, 14 Wis. 325; *Bank v. Lucas*, 21 Neb. 280; *Bank v. Bank*, 48 N. J. Law, 513; *Duke v. Markham*, 105 N. C. 131; *Mining Co. v. Mining Co.*, 80 Mich. 491; *Lockwood v. Boom Co.*, 42 Id. 536; *Doyle v. Mizner*, Id. 332; *Bank v. Barge Co.*, 52 Id. 438; *Stevens v. Iron Co.*, 57 Id. 427; *Kendall v. Bishop*, 76 Id. 634.

3. There was no such holding out or appearance of authority in Smith, by the corporation, as to render this agreement valid. Giving the agent authority to transact the ordinary business of the corporation does not authorize him to transact business of an extraordinary character, nor warrant parties dealing with him in regarding him as so authorized; citing *Iron Mine v. Bank*, 39 Mich. 653; *Iron Mine v. Bank*, 44 Id. 358; nor can complainant claim any advantage from the fact that Smith was allowed to manage the business as he did, or because of the failure of the board of directors or stockholders to hold meetings; citing *Iron Mine v. Bank*, 39 Mich. 653.

4. The agreement does not purport to be, nor is it intended, as an absolute sale of such accounts, but as a security for existing and future indebtedness arising in the manner therein expressed. It cannot operate as a pledge, no possession of the accounts having been given to the complainant; citing *Holmes v. Hall*, 8 Mich. 66; and, being a security, in order to be of force it must be construed as a chattel mortgage of undescribed and indefinite accounts, existing and to be acquired in the future. Assignments of accounts have been frequently recognized as chattel mortgages; citing *Neumann v. Mining Co.*, 57 Mich. 97; *Sperry v. Clarke*, 76 Iowa, 503; and, if this agreement is to be construed as a chattel mortgage, the rule as to what is a necessary description of chattels in a mortgage ought to apply; and no good reason can be assigned why the same rule should not apply even though it should not be treated as a chattel mortgage.

5. The rule that title to goods and chattels does not pass while something remains to be done by the vendor, in order to identify or set them apart, must apply to accounts, as well as any other chattels. Had a list of the accounts intended to be assigned been attached to the agreement, the case would have been much stronger; but even then, if they had not been delivered to the bank, but left, as in this case, under the control and custody of the assignor, to use as it saw fit, the bank could not maintain its case as an equitable assignment of the existing accounts; citing *Christmas v. Russell*, 14 Wall. 69; *Trist v. Child*, 21 Id. 441; *Tiernan v. Jackson*, 5 Peters, 579; *Rogers v. Hosack's Ex'rs.*, 18 Wend. 319; Coleb. Coll. Secur. § 429.

6. An equitable assignment passes all the rights of the assignor in the thing assigned, and from the time of the assignment the assignor can exercise no control over it; citing 6 Amer. & Eng. Enc. Law, 663, and note.

7. It is not every attempt to transfer or give a right to a fund that amounts to an equitable assignment. It has been repeatedly held in this State, and is a general doctrine, that a draft is not an assignment of the fund in the drawee's hands, although it is an order on him to pay the sum stated in the draft; citing *Grammel v. Carmer*, 55 Mich. 201; *Moore v. Davis*, 57 Id. 251; and an assignment of choses in action must be accompanied by a delivery of the evidence of the debt, if any; citing *Palmer v. Merrill*, 6 Cush. 282.

8. The principle asserted by these cases disposes of the complainant's claim to an 'equitable assignment of existing choses in action. The matter rested for the time being in agreement, and did not in law or equity amount to a present transfer; citing *Rodick v. Gandell*, 15 Eng. Law & Eq. 30; *Ford v. Angelrodt*, 37 Mo. 50.

9. The description of property in a chattel mortgage, or other paper intended as a security, must be such as to distinguish it from other property of the same kind; citing *Richardson v. Lumber Co.*, 40 Mich. 203; *Cass v. Gunnison*, 58 Id. 108; and it is to be interpreted in the light of facts known to, and in the minds of, the parties at the time it was made; citing *Willey v. Snyder*, 34 Mich. 60; *Wade v. Strachan*, 71 Id. 459; *Curtis v. Wilcox*, 49 Id. 427.

10. The agreement, if otherwise valid, is void against the classes of creditors designed to be protected by notice, because it was not filed as required by statute; citing *Brown v. Brabb*, 67 Mich. 17; and whatever doubt exists as to the necessity of such filing must be solved in favor of the creditors and against complain-

ant; citing *Anderson v. Brenneman*, 44 Mich. 202; *Bank v. Summers*, 75 Id. 111.

*Edwin F. Conely,* of counsel for appellants, contended:

1. By the record it is established that Smith was not authorized in express terms, by the by-laws, to execute the instrument in question, or any other incumbrance or instrument of like character, nor was such authority given to him by any resolution of the board of directors; and, there being no other source of express authority, it is clear that he had none.

2. What, then, are the acts which Smith did as the representative of the company, which the stockholders or board of directors knowingly suffered him to do without express direction, and from which authority to execute and deliver the agreement sought to be enforced may be implied?

*a*—He collected and paid out money and signed receipts, etc., therefor. But, as treasurer, he had express authority for this under the by-laws. Besides, this grant of power is not broad enough to include the right to mortgage or incumber the property or estate of the principal, and no implication of greater authority than it contains can arise from an express grant.

*b*—He signed notes and acceptances. But, as treasurer, he had express authority for this under the by-laws, and, under the familiar principle *expressio unius est exclusio alterius*, the specification of what instruments he might execute excludes the others. Further, the implication of authority would not extend further than the scope of the power exercised in doing the act. The assumption of authority, acquiesced in by the board, to give the mere promissory notes of the company for a valuable consideration received, or to accept just drafts upon it in the ordinary course of business, would not raise the implication of power to incumber or mortgage the property or assets of the principal.

*c*—He borrowed money for the benefit of the company. But this was in the ordinary course of business, and in the most common manner. If the board of directors ever intelligently acquiesced in his acts in this regard, they certainly went no further than to assent to his borrowing money upon its unsecured promissory notes, or by selling, or using as collateral to such notes, commercial paper, which is the ordinary collateral available at banks.

*d*—He employed men, sold goods, contracted to build mills, etc. But this was in the ordinary course of business. Besides, the record shows that in November, 1884, it was not understood by Smith or the board that his power in this direction was without limitation. When it came to the employment of

a "general office man," the authority of the board was invoked.

3. As to whether Smith had power to execute the agreement solely in virtue of his office, counsel cited *Mining Co. .v. Senter*, 26 Mich. 73; *Manfg. Co. v. McAlister*, 36 Id. 327; *Fitch v. Hydraulic Co.*, 44 Id. 74; *Iron Mine v. Bank*, Id. 344; *Walker v. Railway Co.*, 47 Id. 338; *Jones v. Avery*, 50 Id. 326; *Scudder v. Anderson*, 54 Id. 122; *Mulcrone v. Lumber Co.*, 55 Id. 622; *Stevens v. Iron Co.*, 57 Id. 427; *Steel Works v. Bresnahan*, 60 Id. 332; *Bond v. Railroad Co.*, 62 Id. 643; *Whitaker v. Kilroy*, 70 Id. 635; *Lumber Co. v. Williams*, 73 Id. 86; *Ten Eyck v. Railroad Co.*, 74 Id. 226; *Eakins v. White Bronze Co.*, 75 Id. 568; and, as to powers of president, see 1 Mor. Corp. § 537, and cases cited in text and notes; and, as to powers of cashier, see Id. §§ 539, 540, and cases cited in text and notes; and it will be borne in mind that Hayes testifies that complainant agreed to loan $50,000 without security, and that the amount actually loaned in that manner was about $75,000, so that the security as taken was for an antecedent debt for the most part; citing *Hoyt v. Thompson*, 5 N. Y. 320; *State v. Davis*, 50 How. Pr. 447; *England v. Dearborn*, 141 Mass. 590.

4. But there are good reasons for holding this assignment or agreement uncertain, indefinite, and insufficient; and in this connection it should be borne in mind that the complainant is seeking specific performance, or what is tantamount to it.

*a*—The assignment does not specify any particular account or accounts.

*b*—It does not specify any known legal or definite interest in the accounts, as all, or any fractional part. Neither the "mass of accounts," nor even the mass of "good and collectible" accounts, "as a *unit*," comes under the agreement in question.

*c*—It does not furnish any practicable means of ascertaining and separating what the complainant on the face of the paper might demand. There is no evidence but that, when Smith gave the paper, there was $300,000 in "good and collectible" accounts, so called, whatever that term may or may not mean. Besides this, there was a large mass of accounts believed to be doubtful or worthless. What means does the contract furnish by which, without the further concurrence or acts of both of the parties, $150,000 of "good and collectible accounts" can be separated or distinguished, not only from the great mass of accounts of all kinds, aggregating over $900,000, but from the mass of good and collectible accounts, amounting, as was supposed, to "not less than $300,000?" It is argued that a receiver can be appointed to collect the accounts, and that he can upon such collection turn over $150,000 in cash, or all cash that is

realized. But the parties did not agree that the complainant should have that amount in cash, or all the cash if $150,000 was not reached. Here again complainant's counsel make this instrument a mortgage upon *all* of the accounts, good, bad, and indifferent, when it is nothing of the kind, and it was not so intended by the parties.

5. The statute gives the assignee of a chose in action a right to sue in his own name. But let us suppose the case of an action at law by the complainant in its own name, upon some existing account, and that it undertakes to establish its title by this assignment or agreement. The result is obvious. Or, suppose a debtor of the Purifier Company, when garnished, should set up that his account had been assigned to complainant, and attempt to prove it by the paper in question, of what avail would be his claim? But, say complainant's counsel, these are proceedings at law, while we are pursuing an equitable remedy. True, but while equity may furnish a *remedy* when the law does not, it cannot make certain an agreement which would not be certain at law if the subject of such agreement were one which a legal remedy would reach. If, in the case of chattels or movables, the agreement of transfer is so indefinite that an action of replevin or trover cannot be based thereon, how, on the same agreement, may you have specific performance when the subject-matter is land or accounts, unless equity can make a new contract for the parties? citing *Blanchard v. Railroad Co.*, 31 Mich. 43.

CAHILL, J. The bill in this cause was filed to enforce the following agreement entered into July 10, 1889, by George T. Smith, claiming to act for and on behalf of the George T. Smith Middlings Purifier Company, and to be authorized as its president and treasurer to execute the same:

"WHEREAS, The George T. Smith Middlings Purifier Company is indebted to the Preston National Bank on its own paper, and for indorsements on commercial paper, and will hereafter be likewise indebted; and—

"WHEREAS, The George T. Smith Middlings Purifier Company has on its books not less than three hundred thousand ($300,000) dollars in good and collectible accounts:

"Now, therefore, said George T. Smith Middlings Purifier Company does hereby set aside and assign to the

Preston National Bank of Detroit one hundred and fifty thousand ($150,000) dollars of such good and collectible accounts now existing, or that shall hereafter accrue or be acquired in the conduct of the business of the said George T. Smith Middlings Purifier Company, which said one hundred and fifty thousand ($150,000) dollars of the good and collectible accounts shall be held by said Preston National Bank as collateral for any indebtedness of any kind or nature which may now or hereafter be due and payable from the said George T. Smith Middlings Purifier Company to the said Preston National Bank of Detroit.

"GEO. T. SMITH MIDDLINGS PURIFIER CO.,
"By GEO. T. SMITH, President and Treasurer.
"Dated Detroit, Mich., July 10, 1890."

The facts material here to be considered are, substantially, as follows: The complainant is a national bank organized and doing business in Detroit. The George T. Smith Middlings Purifier Company is a corporation duly organized for manufacturing purposes under Act No. 41, Laws of 1853, p. 53, How. Stat. chap. 122, and doing business at Jackson, Mich. It was engaged in manufacturing mill machinery. It also took contracts for building mills. These contracts ran from $2,000 to $30,000 each. Its business was large, and amounted to from $400,000 to $500,000 annually. Section 9 of the act under which it is incorporated (How. Stat. § 4009) provides that—

"The stock, property, and affairs of such corporation shall be managed by not less than three nor more than nine directors, as the articles shall determine."

The articles as filed provide for three directors. Section 1 of the act authorizes it to—

"Elect, in such manner as they shall determine, all necessary officers, * * * and determine their duties, and make from time to time such by-laws, not inconsistent with the Constitution and laws of this State, as a majority of the stockholders shall direct."

The by-laws adopted relating to the officers and their duties are as follows:

"1. The officers of this corporation shall be a president, secretary, treasurer, and general superintendent.

"2. Any person may hold two or more offices at the same time.

"3. The president shall be the presiding officer at all meetings of the board of directors, and shall have general supervision over the property and affairs of this corporation.      *      *      *      *      *      .      *      *      *      *      *

"5. The treasurer shall have charge of all the funds, deeds, patents, leases, contracts, notes, securities, and all other valuable papers of this company; shall collect and pay out all moneys, and sign all acceptances and notes in its behalf.

"6. The general superintendent shall have general supervision and management of the affairs of the corporation, subject to the president and board of directors, and shall make all contracts in behalf of the corporation except when the by-laws otherwise provide."

The by-laws relating to the meetings are as follows:

"7. The annual meeting of the stockholders shall occur on the first Monday in May of each year.

"8. The board of directors shall have regular meetings on the first Monday in May of each year, immediately after the adjournment of the stockholders' meeting, and at such other times and places as the president may direct."

On May 5, 1884, stockholders' and directors' meetings were held. George T. Smith was elected president, treasurer, and general superintendent. No other meeting of the stockholders was held until May 13, 1889. At this stockholders' meeting there were present George T. Smith, Frank M. Smith, his son, Alonzo Bennett, George S. Bennett, Francis D. Bennett, and M. Harmon. Eliza B. Smith was represented by George T. Smith, holding her proxy. George T. Smith, Frank M. Smith, and Francis D. Bennett were unanimously elected directors. Special meetings of the board of directors, called by the president, were held on November 8, 1884, on December 29, 1887, and on October 1, 1888. At each of these meet-

ings some special matter of business, not material to this case, was transacted, but no directors' meeting for the election of officers was held from May, 1884, to May 13, 1889. A directors' meeting for the election of officers immediately followed that of the stockholders on May 13. All of the directors were present. George T. Smith was elected president and treasurer, Francis D. Bennett, vice-president, and Milford Harmon, secretary. No superintendent was elected. As the statute provides that officers shall hold until their successors are chosen, George T. Smith must be considered as holding over in the office of superintendent. The next meeting of the directors was held October 3, 1889, at which the only business transacted related to the plat of the George T. Smith addition to the city of Jackson, which was approved, and the president authorized to sell lots at the prices fixed, and to sign necessary deeds and contracts for the same in the name of the company.

The corporation made an assignment under the statute for the benefit of its creditors on January 14, 1890, to the defendants Emerson and Eldred, who have since, for reasons not material here, been removed as assignees, and appointed receivers, upon a bill filed by some of the creditors in the circuit court for the county of Wayne, to which county the proceedings relating to such assignment had been removed. *Kittridge v. Circuit Judge*, 80 Mich. 200.

It is apparent from the record that, during the last five years the corporation did business, George T. Smith was permitted to manage the affairs of the company very much as he pleased. There were no meetings of the stockholders, and no regular meetings of directors. As president, treasurer, and superintendent, he had, by the by-laws, been invested with extensive powers of management and control, and such power had been exercised by him

freely, and if not without advice, certainly without objec-
tion, on the part of any of the stockholders or directors.
It appears undisputed that the corporation was in the
habit of borrowing large sums of money from the banks
on its own paper, and on the paper of its customers
indorsed by it. George T. Smith testified that it was
necessary to the successful operation of the business that
this money should be borrowed, and that he had been
accustomed, since the organization of the company, to
make loans, and give the company's paper therefor,
whenever the exigencies of the business, in his judgment,
required. No question is made here of his right to make
such loans and give the company's notes.

Among other banks with which he did business was
the complainant, with whom he had an understanding
prior to July 10, 1889, by which the company he repre-
sented was to have a line of discounts up to $50,000.
But it appears that the transactions with complainant
bank greatly exceeded that amount, so that on July 10,
1889, the amount had actually reached about $70,000.
At this time the bank wanted security. At an interview
had with Mr. Smith by Mr. Hayes, vice-president of the
bank, the subject of security was discussed, and Mr.
Smith expressed himself as entirely willing to give it.
He had been in the habit of leaving, as collateral to the
company's paper, the paper of its customers. He now
suggested that the company had a large number of
accounts on its books that were good and collectible,
which he estimated at $300,000, and he offered to give
security on these accounts. As a result of this interview,
the agreement of July 10 was drawn up by Mr. Hayes,
executed by Mr. Smith, and left with Mr. Hayes. At
the time this agreement was entered into, there was about
$70,000 of the company's paper in the bank. Subse-
quently this paper was renewed from time to time as it

fell due, and the amount was increased to $85,000. No action was taken to select out from the body of the accounts those which the complainant claimed under the agreement, nor were they ever set apart by the company as belonging to the complainant.

At the beginning of the year, Mr. Emerson had been elected vice-president and treasurer of the company, and the management of the business of the company was practically transferred to him. On January 10, 1890, Mr. Hayes, acting for the complainant, visited Jackson and called on Mr. Emerson, showed him the agreement of July 10, 1889, and told him that the bank was anxious to have these accounts to secure the bank's indebtedness. It does not appear that Mr. Hayes expressly requested Mr. Emerson to turn out to him any specified accounts under such agreement, but it is clear that Mr. Emerson must have understood that Mr. Hayes was there for the purpose of taking some steps that would secure to the bank whatever right was needed to make its agreement good. Mr. Emerson testified that this was the first knowledge that he had of the existence of the agreement, and it does not appear that, prior to this time, any of the directors. or officers of the company, aside from Mr. Smith, had any knowledge of its existence. After taking time to consider, Mr. Emerson denied the validity of the agreement, and Mr. Hayes, on January 11, caused the agreement, or a copy of it, to be filed in the office of the city clerk, as a chattel mortgage is required to be filed. On January 14 following, the assignment was made, as before stated. Three questions are discussed by counsel:

1. Did George T. Smith have authority to execute the agreement of July 10 so as to bind the company?

2. Is the agreement such a one as can be enforced, conceding it to have been made by due authority?

3. Conceding the agreement to be valid as between the parties, is it void as to creditors who became such between July 10, 1889, and January 11, 1890, because the instrument was not filed?

1. As to the authority of Mr. Smith to execute the agreement for the company. We have seen that the general powers conferred upon Mr. Smith by the by-laws were very extensive, and that the powers so conferred were actually exercised by him with very little supervision by the board of directors from 1884 to 1890. The language of the by-law defining his duties as president is quite as broad as the provision of the statute concerning the powers of the directors. The statute says the stock, property, and affairs of the corporation shall be managed by a board of directors. How. Stat. § 4009. The by-law says the president "shall have general supervision over the property and affairs of the corporation." By section 1 of the statute, the stockholders have power to determine what the officers shall be, and to define their duties. How. Stat. § 4001. Conceding that the president must exercise his powers of management in subordination to the board, yet, when, as in this case, the stockholders, being the owners, have seen fit to vest certain extraordinary powers of management in the president, and certain other powers in the treasurer and superintendent, and the directors, with full knowledge of this, elect a man to fill all those offices, and thereafter put no restraint upon his management, the board must be held to have consented to his exercising all the power reasonably included in the language by which it was conferred. *Bank v. Comegys,* 12 Ala. 772. The right of the directors to make the security in question is not disputed, yet their authority is given in language no broader than that which defines the duties of the president.

If it be said that the stockholders could not thus usurp

the powers of the board and confer them on the president, it may be said that the right of the directors to delegate certain of their powers of management to the officers is undoubted, and, if the consent of the board was needed to fully invest the president with the power given to him in the by-laws, that consent has been given in this case. The question of Mr. Smith's power is largely one of intention on the part of the stockholders and directors. As bearing upon this question of intention, the fact that no corporate meetings were held for five years after the by-laws were adopted is an important circumstance. It is claimed that the neglect to hold corporate meetings can have no bearing in this case, because it is not shown that complainant knew of this fact, or was influenced by it; and we are referred to the case of *New York Iron Mine v. Negaunee Bank*, 39 Mich., on page 655, where some language of Mr. Justice Cooley to that effect is found. In that case the only question was whether the bank had been influenced to rely upon Wetmore's apparent authority, which did not in fact exist, to make the paper in question. The question is different here. It is not one of apparent power to do an act conceded to be fraudulent and void unless the corporation was estopped by its conduct to allege the fraud, but it is a question of actual power in Mr. Smith, as the president, treasurer, and manager of this corporation, to perform an act entirely legal and proper if authorized. The intention to confer such power may be evidenced by their failure to act in opposition to or in restraint of a course of business they have themselves permitted if not established.

It is an ordinary occurrence for manufacturing or trading concerns, whose products have sometimes to be carried to await a favorable market, to draw against such products for the money needed to carry them, and, if requested, some form of security upon such products is

given. If this be permissible, shall the right to give security exist only so long as the goods are in store, or may they be sold on credit, and the accounts due for such sales be substituted with the consent of the creditor? If not, then trade is hampered, the debtor is put into the hands of the creditor, and the latter cannot release him, if he would, without risk. The right of Mr. Smith as president and treasurer to borrow money for the legitimate needs of the business, and to give the company's paper, is not contested. The duty to pay is involved in the power to incur debts. In the case of this corporation, its power to pay its debts depended on the profitable sale of its products, and the collection of the money due on such sales. If it could not otherwise dispose of its products, it could turn them out to its creditors in payment of or as security for such debts. If its goods were sold on credit, these credits stood as the representatives of the goods, and the same use could legitimately be made of them. This is not like giving security upon all the corporate property, the enforcement of which may involve the corporate existence. The giving of this security or its enforcement did not necessarily interfere with the prosecution of the corporate business. It was given upon property and credits already devoted in equity and good conscience to the payment of its creditors, of whom the bank was one. The effect of it was simply to give complainant priority of lien.

We have been cited to a large number of decisions to show that no such power as was here assumed by Mr. Smith can be exercised by any agent of a corporation without express authority to do that act from the board of directors. It is not necessary to review them here. I have examined them with care. They are not altogether free from conflict, although if the exact point necessary to be decided in each case be kept in mind, and the

language used be given no broader meaning than the facts of the particular case require, the conflict will be found to be more apparent than real. *Kimball v. Cleveland*, 4 Mich. 606; *Joy v. Plank-road Co.*, 11 Id. 155; *Peninsular Bank v. Hanmer*, 14 Id. 208; *Adams Mining Co. v. Senter*, 26 Id. 73; *New York Iron Mine v. Negaunee Bank*, 39 Id. 644; *Star Line v. Van Vliet*, 43 Id. 364; *New York Iron Mine v. Citizens' Bank*, 44 Id. 357; *Eureka Iron & Steel Works v. Bresnahan*, 60 Id. 332; *Dwight v. Lumber Co.*, 67 Id. 507; *Delta Lumber Co. v. Williams*, 73 Id. 86; *Genesee Co. Sav. Bank v. Michigan Barge Co.*, 52 Id. 438; *Kendall v. Bishop*, 76 Id. 634; *Stokes v. Pottery Co.*, 46 N. J. Law, 237; *Bank v. Bank*, 48 Id. 527 (7 Atl. Rep. 327); *Fay v. Noble*, 12 Cush. 1.

In this connection it need scarcely be said that the strict limitations that govern public corporations and their officers are not to be applied with the same strictness to private business corporations. There are no questions of public interest to be affected by the exercise of corporate power by one agent rather than another in a private corporation. No questions of public policy are involved. The concern is purely private, affecting no one but the owners. What the owners consent to expressly or permissively they ought not to be allowed afterwards to deny. Mor. Priv. Corp. § 632; *Steel Works v. Bresnahan*, 60 Mich. 332. In *Genesee Co. Sav. Bank v. Michigan Barge Co.*, 52 Mich. 443, Judge ·SHERWOOD uses this language:

"All the stockholders having any interest in the Barge Company had knowledge of the transaction; substantially that Ferry & Brother ran the Barge Company."

The same is true of Mr. Smith in this case. Every stockholder and director knew, or would have learned if they looked into its affairs, as they were bound to do, that George T. Smith ran the purifier company; that he

assumed to do this by force of the by-laws, which on their face gave full authority; and that by years of practice his construction of the by-laws had been acquiesced in.

2. Is the agreement such a one as can be enforced by a court of equity, conceding it to have been made by due authority? It is urged by defendants' counsel that it contains infirmities which render its meaning doubtful, if they do not wholly prevent its taking effect as a valid contract. The thing principally relied on in support of this position is that the agreement is not sufficiently certain in its description of the property. It is said that no particular accounts were designated in the instrument, and no steps were provided for or taken by the parties afterwards to select out such accounts as were intended to be covered; that there is now no way of identifying those which the complainant claims. The accounts are designated as $150,000 of good and collectible accounts now existing, or that shall hereafter accrue or be acquired in the conduct of the business. The objection to this description is that, as these accounts were to be selected out of a mass of not less than $300,000 of similar accounts, there is no way of making the selection without the further concurrence or acts of both the parties; that to make such selection requires the exercise of judgment upon the part of some one, and the instrument does not designate whose judgment shall control.

The important thing to be determined is—

1. What the parties intended.
2. Whether they have so expressed their intentions that the court can execute them.

It was not supposed by the parties that the security would cover all the good accounts on the books of the company. It was estimated that they would aggregate

not less than $300,000, and of these there were set aside for the bank $150,000. It was contemplated that the accounts were good, and that the bank should have them at their face value, and not necessarily enough of them to realize that amount in cash. This indicates that it was not intended to wind up or cripple the company in its business. It is equally clear that it was expected the particular accounts intended to be assigned were to be at some time, if it became necessary to enforce the security, selected from the body of similar accounts, and turned over to the bank for collection. How was it expected the selection would be made? It must be made in such a way, of course, as to give neither party any advantage over the other. If there were several grades from which the selection was to be made, the task might be difficult, as in the case of lumber and other commodities that are graded in the markets into several classes greatly varying in value. But there can be only two grades of accounts, the good and collectible, and the bad and uncollectible. If an account is good and collectible it cannot be any better, and if it is bad and uncollectible it cannot be any worse. If the selection be left to agreement between the parties, the security might be defeated altogether by a failure to agree, and, if left to the company, the bank might be defrauded by having poor accounts set off to it, whereas the bank was entitled to the best accounts on the books to the extent called for by the agreement, because by no process of selection could it secure any better than the contract called for. Equity would require the selection to be made so as to give neither party an advantage. As this could only be accomplished by allowing the bank to make the selection, the parties must be held to have so intended. It is clear also that it was not intended that the security should be confined to the

accounts standing on the books of the company on July 10, 1889, but that it should extend to and include accounts that should afterwards accrue or be acquired in the conduct of the business.

Having ascertained what the parties intended by their agreement, we have, by the same process, determined the second proposition. If the agreement is sufficiently definite and certain so that the intention of the parties can be determined, then the courts can specifically enforce it, if it be also one that ought to be enforced. If the agreement had contained the words "to be selected by the bank," and the bank, immediately upon the execution of this agreement, had called on the company to allow it to select out the accounts assigned to it, and such request had been refused, I have no doubt of the power of a court of equity to compel the company to give the permission. If that was the intention, how is the difficulty any greater? The intention was that the security should be a continuing one, giving the same lien upon accounts afterwards accruing as upon those actually existing when the contract was made. The right of a debtor to give security upon property to be by him afterwards acquired in the course of business has been recognized in this State in numerous cases, commencing with *Leland v. Collver*, 34 Mich. 418. See, also, *Cigar Co. v. Foster*, 36 Mich. 368; *Robson v. Railroad Co.*, 37 Id. 70; *Eddy v. McCall*, 71 Id. 497; *Fuller v. Rhodes*, 78 Id. 36. I can see no reason that will support those cases which will not apply with equal force to this.

3. The last point urged against the validity of this agreement is that it was in effect a chattel mortgage, and is therefore void as to the creditors of the company represented by the receivers, because not filed in the office

of the city clerk, under How. Stat. § 6193, which reads as follows:

"Every mortgage, or conveyance intended to operate as a mortgage, of goods and chattels, which shall hereafter be made, which shall not be accompanied by an immediate delivery, and followed by an actual and continued change of possession, of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers or mortgagees in good faith, unless the mortgage, or a true copy thereof, shall be filed in the office of the township clerk of the township, or city clerk of the city, or city recorder of cities having no officer known as city clerk, where the mortgagor resides, except when the mortgagor is a non-resident of the State, when the mortgage, or a true copy thereof, shall be filed in the office of the township clerk of the township, or city clerk of the city, or city recorder of cities having no officer known as city clerk, where the property is."

This statute cannot be construed to apply to the agreement in this case. It applies only to goods and chattels which are capable of delivery, and the filing of the security is to take the place of such delivery, when it is not made, as it might have been. There is no way in which an account can be delivered. It has no tangible entity, and exists only as an incorporeal right. Neither the thing itself nor any evidence of it is capable of delivery. Similar statutes in other states have received this construction. *Monroe v. Hamilton*, 60 Ala. 226, 233; *Kelly v. Thompson*, 2 Heisk. 278, 281; *Bank v. Huth*, 4 B. Mon. 423, 449; *Newby v. Hill*, 2 Metc. (Ky.) 532; *Brady v. State*, 26 Md. 296; *Marsh v. Woodbury*, 1 Metc. (Mass.) 436; *Williamson v. Railroad Co.*, 26 N. J. Eq. 398, 403; *Booth v. Kehoe*, 71 N. Y. 341, 344; *Bacon v. Bonham*, 27 N. J. Eq. 209, 212; *Kirkland v. Brune*, 31 Grat. 127; *Bank v. Gettinger*, 3 W. Va. 317; *Tingle v. Fisher*, 20 Id. 497. The duty to file arises under the statute, and of

course only such instruments need to be filed as are covered by the statute.

No fault is found with the form of the decree, if complainant is entitled to the relief payed for.

The decree will be affirmed, with costs.

LONG and GRANT, JJ., concurred with CAHILL, J.

CHAMPLIN, C. J. I cannot concur in the opinion of my brethren in this cause. I place my dissent upon the ground that the contract which is sought to be specifically performed is too uncertain and indefinite as to the subject-matter to be specifically enforced. No property is described so that the court can lay hold of it and compel performance. Its identity is not now defined, and I cannot see how this Court can decree the specific performance of an agreement which is yet to be ascertained through a selection made by complainant. Were it a sufficient contract as to accounts in existence at the time the contract was made, I do not think future accounts could be included in its terms, and be specifically performed. This adds uncertainty to uncertainty as to the subject-matter of the contract.

MORSE, J., concurred with CHAMPLIN, C. J.