### In re MACAULEY.

#### (District Court, E. D. Michigan. March, 1907.)

1. BANKRUPTCY—TRANSFERS BY BANKRUPT—ASSIGNMENTS—PAROL AGREEMENT.
   An oral contract made and performed in Michigan, by which a bankrupt assigned the outstanding accounts of his business to claimant in consideration of claimant's indorsement of the bankrupt's paper, which claimant performed more than four months prior to the institution of bankruptcy proceedings, was valid, though some of the accounts had not yet accrued.

2. SAME—DELIVERY.
   It was no objection to the validity of an equitable oral assignment of certain accounts that actual possession thereof was not transferred.

3. ASSIGNMENTS—"EQUITABLE ASSIGNMENTS."
   An equitable assignment is an assignment of a portion of a debt which a court of equity will recognize and a court of law will not.
   [Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2434–2437; vol. 8, p. 7652.]

4. SAME—RECORD.
   A parol equitable assignment of accounts made and to be performed in Michigan was not objectionable because it was not recorded, such assignment not being an agreement to which the Michigan statute, requiring record of chattel mortgages, is applicable.

5. EVIDENCE—BEST EVIDENCE—DECLARATIONS.
   Parol evidence of financial statements alleged to have been made by a bankrupt was properly excluded in the absence of nonproduction of written statements.
   [Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 556.]

6. BANKRUPTCY—TRANSFERS BY BANKRUPT.
   Where a bankrupt orally agreed to assign certain accounts to claimant in consideration of the latter's indorsement of the bankrupt's paper in Michigan, and stated to claimant that he had assigned such accounts to him, the bankrupt being under no legal or equitable obligation to give notice of the agreement, it was not void because he did not put it in writing, for the reason that he considered if he did so he would not be able to retain the money he collected on the accounts, and apply it according to the exigencies of his business.

**7. SAME—EXECUTORY CONTRACT.**
  A bankrupt orally contracted to assign the accounts of his business to claimant in consideration of the latter's indorsement of his paper for $15,000, and told claimant that he had assigned the accounts to him, whereupon claimant indorsed the bankrupt's paper to the amount specified, but no written assignment was ever made. *Held*, that the agreement was not objectionable as an executory agreement to assign the accounts in futuro.

On Exceptions to Referee's Findings and Report on the Claim of W. E. A. Bulkeley. The opinion states the case.

Miller, Smith, Alexander & Paddock, for petitioner.
Maybury, Lucking, Emmons & Helfman, for trustee.

SWAN, District Judge. Macauley was adjudicated a bankrupt on his own petition November 23, 1904. The petitioner is his brother-in-law, and resides in Connecticut. The bankrupt had been engaged in business in Detroit for several years. He had received financial aid in starting in business from his father-in-law, the petitioner's father, who died in November, 1902, leaving a last will and testament, in which he required repayment of the loan to the bankrupt, and provided that in default thereof the amount—some $15,000—should be charged against the share of the bankrupt's wife in his estate. This fact was known to the petitioner and the heirs of the father. In January, 1903, the bankrupt visited Hartford, and stated to petitioner, as the latter testifies—

"that his business had outgrown his limited capital * * * and wanted to borrow money; * * * that if he could get additional capital, that is for a number of years, in some way he thought he could make his business a success, and very comfortably provide for his family in the years to come, * * * that is, he asked me if I could give him any money, and I told him I did not have any to loan him myself * * * —no ready money—and he said if I would indorse for him he could borrow money in the Detroit banks, and he talked $15,000. It seemed more than I wanted to indorse for, and I persuaded him to say he could get along with $10,000, and I asked him how I should be secured in any way, and he said all he could offer me as security was some insurance policies he had in the Ætna Life Insurance Company—four policies aggregating $15,000. He further said that he would assign to me the book accounts or any future book accounts as long as I continued these indorsements, because the indorsements were for an indefinite period. He thought that he would not need any indorsement after three or four years, but of course could not tell, and with this understanding he returned to Detroit and arranged to borrow $15,000 with my indorsement. He sent the notes to Hartford, and I indorsed them and returned them to him. He got the money from the First National Bank. Those were the first notes I indorsed for him—four notes for $2,500 each."

These notes were sent the bankrupt January 27, 1903, as is evidenced by the registry receipt of that date. The petitioner testifies positively that the indorsements were made on the assurance of Macauley's assignment of the book accounts to him, "because," as he states, "I would have had no security of any sort at all for my indorsement, with the exception of these insurance policies, which were new policies practically, and had no value to me, and of course with the idea of continuing the indorsements from time to time I would have to have the book accounts; and it was my understanding as he talked to me that these book accounts and bills receivable at any

time while I endorsed for him were pledged to me to cover my indorsements." That the bankrupt submitted to him a statement at the time of the agreement for indorsement showing bills receivable approximately $30,000 in amount, and assured petitioner that it was his privilege at any time to take the business to protect himself. Pursuant to this arrangement petitioner indorsed between January 27, 1904, and the bankruptcy for renewals and for accruing obligations of the bankrupt some 40 promissory notes, all of which were produced and identified. Four policies of life insurance—one for $1,000; two for $5,000 each, and one for $4,000—are produced and identified at those which were turned over to petitioner when the parol assignment was made. But one of these has any cash value, and that is but $29.02. The evidence is undisputed that petitioner has paid $15,000 and upwards on his indorsements, and the proceeds of all the notes went into the bankrupt's business. The testimony of the bankrupt fully corroborates in all essentials that of the petitioner as to the assignment, the time, place of its execution, and the consideration for which it was given. The proofs are explicit that the agreement covered all the book accounts and bills receivable "at that time or might exist at any time while I [petitioner] was indorser," and that this was the result of two conversations between him and the bankrupt; that petitioner had no knowledge before November, 1904, that Macauley was in financial straits. His first protested note—indorsed by petitioner—matured November 29, 1904, after the adjudication. There is therefore no question of preference in the case, nor is there any controversy as to the terms of the agreement under which the petitioner indorsed, save as to its legal effect. The only criticism upon the testimony in its support is that it comes from interested parties—the petitioner who is naturally desirous of recouping his loss, and the bankrupt, his brother-in-law, whose relation to him suggests a bias in the former's favor. The finding of the referee does not discredit the testimony of petitioner or the bankrupt. He expressly disclaims any reflection upon its truthfulness. His conclusion is in terms based upon two propositions: (1) The competency of the conversations to establish the assignment, and (2) the fact that possession of the accounts was not taken under the assignment. November 16, 1904, about a week before the bankrupt filed his petition for adjudication, he executed a written assignment to petitioner and to Sarah B. Macauley, his wife, of the book accounts and bills receivable of R. H. Macauley & Co. (the bankrupt's firm name), which confirmed the parol agreements it recited to have been made with the grantees for their indorsements, and expressed its purpose to secure Bulkeley and Mrs. Macauley against loss on such indorsements. This instrument was made without the knowledge or consent of Bulkeley, and solely because of the bankrupt's desire to further secure the grantees in pursuance of the agreements under which he obtained the indorsements. In itself it has no legal efficacy, and is not to be considered as against petitioner. Its primary purpose was to protect Mrs. Ma-

cauley if there should be a surplus after paying petitioner. The referee's expressed reasons for the rejection of the claim are that he—

"was not convinced that there was such an absolute transfer of those book accounts as the law requires. * * * There is no delivery of possession, and without reflecting in the least upon the testimony of parties as given, one can readily see that the door would be opened to fraud of the worst character, if upon the simple statement of the two parties in interest a transaction of this kind could be proved. * * * Again, in my opinion, if such an assignment were made it would not take effect until the party proceeded to take possession under it."

The question presented, therefore, is simply as to the legal effect of the testimony—whether assuming its credibility it suffices to establish an assignment. It must be conceded that an agreement resting for its support upon the testimony of the two parties to it is suggestive of bias and open to suspicion, especially where the amount at stake is large, and there is no written evidence of the fact in controversy. But when it is not opposed by any evidence, except the considerations suggested by the interest of the petitioner and his relationship to the bankrupt which the referee rejected as factors in his judgment, and undisputed facts tend to corroborate it, the referee's denial of the petition must be referred to the competency of the evidence accepting its truthfulness. It follows, therefore, that the exceptions to his ruling present a pure question of law.

The considerations tending to corroborate the testimony of Bulkeley and the bankrupt, are: (1) The bankrupt visited petitioner intending and prepared to obtain financial aid upon the security of his bills receivable and his policies, as is evident from the fact that he presented the statement of the former showing $30,000 outstanding, and by his delivery of the policies—the only security of which he could make delivery. (2) Bulkeley immediately after the Hartford agreement of January, 1903, began and thereafter continued his indorsements of the bankrupt's notes to the extent of $15,000, as he agreed. (3) That with Bulkeley's knowledge that the bankrupt owed the estate of his father-in-law (Bulkeley's father) $15,000 for moneys advanced for the bankrupt's business before 1903, which moneys by the last will of Bulkeley, Sr., who died in November, 1902, were charged to the share of his estate falling to the bankrupt's wife, it is highly improbable that petitioner would have loaned his credit by indorsement or otherwise to his brother-in-law without security, and in reliance solely upon the sanguine hopes of the bankrupt that, "in two or three years his business would be in such a condition as to dispense with the aid of further indorsements." (4) Bulkeley had not the ready money asked by Macauley. His reluctance to lend his credit to the limit of the indorsement desired, and his effort to reduce the limit, strongly indicated in connection with his knowledge of Macauley's indebtedness to the estate of the elder Bulkeley, that the conditions were such as to justify security despite relationship. It cannot be assumed that he was willing to hazard his own patrimony as the bankrupt's wife had done, without security. (5) The delivery by the bankrupt of his life insurance policies to petitioner as part of the security for petitioner's indorsement

is part of the res gestæ of the assignment. Their delivery as part security for the agreement of petitioner to indorse is undisputed. (6) That the bankrupt had no other security to give than the accounts and policies, and that the policies were known to petitioner to be practically worthless, and that Bulkeley required security, and the bankrupt verbally pledged or assigned the accounts receivable of his business as such security, is not contradicted by any testimony in the record.

These and other circumstances are strongly corroborative of the truth of petitioner's testimony that there was a present assignment coterminous with the continuance of the indorsements made by the bankrupt to the petitioner which was followed pursuant to the agreement therefor by the petitioner's indorsements. That it was a valid agreement, though resting only in parol, cannot be gainsaid. It was to be performed in Michigan, and was there performed by the discount of the paper. It was not required to be recorded. Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 364, 47 N. W. 502; 12 A. & Eng. Ency. Law (2d Ed.) 1055. It was an appropriation of the current accounts as they accrued by way of pledge or security which continued in time until the bankruptcy of Macauley. The interest conveyed by an assignment to secure the assignee against liability as an indorser is commensurate in degree and duration with the liability it secures. Hamlin v. European Co., 72 Me. 83. The transaction has all the elements of an equitable assignment of that kind of property as effectually as if it were created by mortgage although not evidenced by writing (Merchants' Nat. Bank v. Gregg, 107 Mich. 148, 64 N. W. 1052; McDonald v. Daskam, 8 Am. Bankr. R. 543, 116 Fed. 276, 53 C. C. A. 554), and meets all the requirements to its validity as an assignment declared in Wright v. Ellison, 1 Wall. 16–22, 17 L. Ed. 555, where it is said "it is indispensable to a lien thus created that there should be a distinct appropriation of the fund by the debtor, and an agreement that the debtor should be paid out of it." It is not material that some of the accounts have not yet accrued. A court of equity would enforce the assignment according to its intent.

In Peugh v. Porter, 112 U. S. 742, 5 Sup. Ct. 364 (28 L. Ed. 859), it is said:

"Here, as between Masser and Porter, on the one hand, and Peugh, on the other, there were words in the agreement of express transfer and assignment of the very fund now in dispute, though not then in existence, which in contemplation of equity is not material."

This language is apposite to the facts in this case. See, also, Ketchum v. St. Louis, 101 U. S. 306–316, 25 L. Ed. 999, where the court quotes with approval, as follows:

"In re Strand Music Hall Company, 3 De G. J. & S., 147, the question arose whether the company had made a valid charge on their real property. Lord Justice Turner said: 'There can, I think, be no doubt that it was intended by these agreements to create a charge upon the property of the company, but it was said by the official liquidator that this intention was not well carried into effect. I apprehend, however, that when this court is satisfied that it was intended to create a charge, and that the parties who intended to create it had power to do so, it will give effect to the intention notwithstanding any

mistake which may have occurred in the attempt to affect it.'" Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865.

The intention of the parties will be enforced in equity. Fourth St. Bank v. Yardley, 165 U. S. 635, 17 Sup. Ct. 439, 41 L. Ed. 855. It is no objection in a court of equity to the validity of the assignment that manual possession of the accounts was not given. There is no way by which an open account can be physically delivered. Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 385, 387, 47 N. W. 502; Spring v. South Carolina Ins. Co., 8 Wheat. 268, 5 L. Ed. 614; McDonald v. Daskam, 8 Am. Bankr. R. 543, 116 Fed. 280, 53 C. C. A. 554. The agreement of the parties transferred to petitioner the equitable title thereto. That effect inheres in the term "equitable assignment"—"an assignment of that much of the debt which a court of equity will recognize and a court of law will not." First Nat. Bank v. Coates (C. C.) 8 Fed. 540, 542; Holmes v. Evans, 129 N. Y. 140, 29 N. E. 233; 2 Am. & Eng. Ency. Law (2d Ed.) 1010 (Title "Assignments").

It was assumed by both parties that the bankrupt would meet his paper, otherwise the latter would not have indorsed. The equity of the transaction needs no vindication. Equally manifest is the intention of the parties that the indorser should be protected by the appropriation of these accounts to his indemnity. "That the owner of a chose in action or of property in the custody of another may assign a part of such rights, and that an assignment of this nature if made, will be enforced in equity, is also the settled doctrine of this court" (citing cases). Fourth Street Bank v. Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855; Preston Nat. Bank v. Geo. T. Smith Co., 84 Mich. 385–387, 47 N. W. 502.

It is clear also that the agreement of the bankrupt was to be performed in and is controlled by the law of Michigan, as the notes indorsed were to be paid in Detroit, Mich. By that law no record of the assignment was required to be made. An assignment of open accounts is not an agreement to which the statute of Michigan regarding the record of chattel mortgages applies. That statute has reference only to goods and chattels capable of delivery. Preston National Bank v. George T. Smith Company, supra. There is, therefore, neither statutory, legal or equitable defect in the assignment, nor valid objection to its enforcement. The objections that the bankrupt did not disclose its existence to the commercial agencies or the banks with which he dealt, and that in his financial statements he classified those accounts as part of his assets, making no mention of any incumbrance thereon, have had due consideration. Some of these objections are not sustained by the proofs, because the written statements were not produced, and parol evidence thereof was properly excluded by the referee upon objection. Conceding, however, that the facts were as claimed as to each and all of those matters, and also that the bankrupt admits that he did not put the assignment in writing because he "would have to transfer certain accounts, and I would not have been able to retain the money I collected on my accounts receivable and use it in paying the debts of the concern," that he "wanted to use all the money he took in to

pay those or any other debts that the business owed," and "did not think he could do it if he put the assignment in writing," these circumstances neither singly nor collectively avail to disprove the execution of the assignment. They were all acts or omissions of the bankrupt not chargeable to the petitioner, nor, so far as the testimony shows, known to or even suspected by him. He was under no legal or equitable obligation to give notice of this agreement, and the law of Michigan made no provision for its record.

The contention that the agreement of January 3, 1903, was purely executory—an agreement to assign the accounts in futuro—not a present executed transfer thereof even by parol, is negatived by the testimony of both petitioner and the bankrupt. The latter states in terms:

"He [petitioner] asked me what I would give him for security. I told him I would assign those accounts, and before we finished the conversation he asked me if I had assigned those accounts to him, and I said yes."

The petitioner's testimony is equally explicit to the same effect as has been shown. The facts epitomized are that the bankrupt assured petitioner that if he would indorse the bankrupt's negotiable paper to the amount of $15,000 he would assign his book accounts to secure the indorser's liability, and then and there assigned them to petitioner by parol for that purpose. The petitioner, on the faith of that assurance and the contemporaneous assignment of that security, indorsed Macauley's paper to the amount of $15,000. The proceeds of these indorsements went into the bankrupt's business, and his creditors have had the benefit of them. It is conceded that the value of the assigned accounts is less than petitioner's liability as indorser. I am constrained by these facts to sustain the exceptions of the petitioner. The proofs establish an executed valid assignment of the accounts to petitioner January 3, 1903. The trustee must pay the proceeds thereof to petitioner. The petitioner is entitled to costs.