JOSEPH B. MOORS *vs.* FERDINAND A. WYMAN & others.

Suffolk. November 16, 17, 1887. — January 9, 1888.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Advances — Pledge — Bill of Lading — Sale — Commission.*

A banker made advances to leather merchants on hides, for which bills of parcels were given to him or bills of lading taken to his order or indorsed to him with power to take possession and sell for his security or reimbursement. He indorsed the bills of lading to the firm to get the hides from the carriers, and gave it the custody upon its express agreement to hold as his agents and to redeliver the identical hides when tanned. *Held*, that the banker took the title to the hides, and did not divest it by his indorsement or release of custody.

On the failure of the firm the banker took possession of the hides as they arrived, and sold them at private sale through reputable brokers at fair prices. *Held,* that the sales were valid, and that the banker was entitled to a reasonable compensation.

A trustee of the firm, holding under a voluntary assignment for the benefit of creditors, charged the banker commissions for sales of leather, and for tanning hides in the vats to prevent their loss. *Held,* that the former item and the latter item, above a certain limit, were rightly disallowed.

HOLMES, J. This is a bill in equity brought by a creditor of the Boston firm of F. Shaw & Brothers, consisting of Fayette Shaw and Brackley Shaw, against that firm; against another firm in Vanceboro, Maine, of the same name, consisting of the above-named Shaws and Thaxter Shaw; and against Ferdinand A. Wyman, to whom both firms have made voluntary assignments for the benefit of creditors. As the objections to the jurisdiction are now waived, and as the assets in controversy have been converted into money, and a large part of the plaintiff's claim has been paid since the filing of the bill, leaving only certain items of the account in dispute, such only of the facts need be stated as are necessary in order to settle these disputed items.

The plaintiff, Moors, made advances to the Boston firm in several ways. 1st. Under what is called the loan account agreement, by indorsing their notes, &c., in Boston, taking as security bills of parcels of specified hides, which the Vanceboro firm were tanning for the Boston firm, and which were delivered by the Boston firm to and held by Thaxter Shaw as agent for the plaintiff with the consent of the Vanceboro firm. The Vanceboro firm agreed that the cost to Moors for tanning should not exceed four cents per pound, and in fact all charges for tanning were paid by the Boston firm to the Vanceboro firm. By the Boston firm's agreement, Moors had power in case of default, or if in his opinion the collateral did not afford a margin of twenty-five per cent above the amount unpaid, to sell at public or private sale without notice; and it was further agreed that all collateral security held by Moors for the Boston firm's account, whether under that contract or otherwise, might be taken and applied as general security for all existing or subsequent indebtedness. This account has been paid off in great part, since the filing of the bill.

2d. The plaintiff issued to the Boston firm letters of credit on Morton, Rose, & Co., of London, under which the firm bought

hides, taking bills of lading to the plaintiff's order by agreement, the plaintiff having a lien on the goods, bills of lading, and policies of insurance, with authority to take possession and dispose of them at his discretion for his security or reimbursement. Before the defendant's failure the practice was for the plaintiff to indorse the bill of lading to the Boston firm, they signing a contract by which they received the hides as his agents, and agreed as such agents to send the hides to specified tanneries of theirs in Maine or New York, and to deliver to the plaintiff upon demand the identical leather into which the hides should be manufactured, the plaintiff not to be chargeable with any expense thereon. The intention of the agreement was stated to be to protect and preserve unimpaired the plaintiff's lien. After the failure the plaintiff took possession of the hides as they arrived, and sold them through reputable brokers for fair prices. The plaintiff has paid Morton, Rose, & Co. the whole amount due them.

3d. The plaintiff obtained letters of credit for the Boston firm drawn upon the Bank of Montreal by the agents of the bank, the Boston firm giving the bank an agreement similar to that with Moors, last mentioned, with authority to the agents to take possession of the goods and dispose of the same at discretion, and to charge all expenses, including commissions, for sale and guaranty. Upon the arrival of the hides the agents of the bank indorsed the bills of lading to Moors, who before the failure indorsed them to the Boston firm under the same form of agreement as stated with regard to bills of lading under the Morton, Rose, & Co. credit. The hides arriving after the failure were sold by him in like manner as before stated. The plaintiff has paid the bank the whole amount due to it.

It is argued for the Shaws that Moors received the indorsed bills of lading as agent of the Bank of Montreal, and that, however this may be, he has lost his rights in all hides received by him under any bills of lading before the failure, and turned over to the Boston firm as Moors's agents. But upon the record before us we must take it that Moors received the hides, as the master's report implies that he did, on his own behalf. The agents of the bank looked to him for payment, and they have been paid. The bank had a title, whether absolute or qualified does not matter. See *De Wolf* v. *Gardner*, 12 Cush. 19; *Forbes*

v. *Boston & Lowell Railroad*, 133 Mass. 154, 156. *Moors* v. *Kidder*, 106 N. Y. 32. Moors got this title by indorsement, and had a similar title originally under the Morton, Rose, & Co. bills of lading. His indorsements of the bills of lading to the Boston firm as his agents did not release this title. It was not a con-veyance in form, and being made only for the purpose of enabling him to get the goods from the carriers, it was not a conveyance in substance or effect. See *Moors* v. *Kidder, ubi supra; Pratt* v. *Parkman*, 24 Pick. 42, 47; *Low* v. *De Wolf*, 8 Pick. 101, 107.

Neither did Moors lose his rights by giving the custody of the hides to the Shaws. They expressly agreed to hold as Moors's agents, and the general rule is perfectly well settled that the custody of a servant or of a mere agent to hold is the possession of the master or principal. The only difficulties that have arisen have been due to the failure to distinguish accurately between such servants or agents and bailees who hold in their own name; *Hallgarten* v. *Oldham*, 135 Mass. 1, 9; or, in the case of pledges, between a delivery to the pledgor for his own purposes and in-trusting him with the custody on behalf of the pledgee. *Kellogg* v. *Tompson*, 142 Mass. 76, 79. It might be argued that policy requires an exception to be made in favor of a *bona fide* purchaser for value from the general owner having the seeming possession of the goods, as against a person whose security depended upon possession, and who had made the owner his custodian. But the Massachusetts cases tend to show that there is no such ex-ception in the absence of fraud. *Kellogg* v. *Tompson*, and *Moors* v. *Kidder, ubi supra. Thacher* v. *Moors*, 134 Mass. 156, 165. At all events, there is nothing in this case to warrant our making one, even assuming that all parties before us are not concluded by the express agreement of the Shaws that the plaintiff's rights should remain. There is nothing in Wyman's position, as to proceeds in his hands, to diminish the rights which Moors had as against the Shaws, nor do his counsel argue that there is, so far as the question of possession is concerned.

The plaintiff has charged a commission of five per cent on the hides sold by him, of which rather more than nine tenths in value was imported under the Morton, Rose, & Co. credit, the rest under that of the Bank of Montreal. The defendants deny

his right to sell at private sale, and more particularly deny his right to charge any commission. We see no reason to doubt that the sale was lawful, and we are of opinion that the plaintiff should be allowed the sum which the master has found to be a reasonable compensation for the services actually rendered by him, namely, two and one half per cent upon the gross sales, or $5,080.65. The argument is strong that the loan account agreement, authorizing the plaintiff to apply all security to any indebtedness, imports an application in the manner and with the incidents there set forth, one of which was a charge of two and one half per cent commission. All of the facts tend to the conclusion that a commission was to be charged. See, further, *Varnum* v. *Meserve*, 8 Allen, 158, 161.

It is admitted that there was due to the plaintiff on April 1, 1886, the sum of $61,448.87, as found by the master. Adding the commission, the amount is $66,529.52. By the master's findings the defendant Wyman had in his hands on the same date $89,533.34, proceeds of the plaintiff's security, or more than enough to pay what remains due, unless Wyman has a right to make certain charges which have been disallowed by the master.

The first of these is a charge of five per cent commission for sales made by Wyman. The master found no agreement to that effect with the plaintiff, and rightly disallowed the charge. There is no reason why a debtor selling his own property to pay his debts should charge his creditor for doing so, and there is no reason why Wyman in this respect should stand in a better position than the Shaws. So far as the sales were made by agreement, the agreement excluded the right to make a charge. It is at least a fair inference that he made the other sales, if rightful, on the same footing.

Wyman's second charge is for tanning the hides which were on hand at the time of filing the bill, and which were mostly in the process of tanning, and could not be removed without serious injury. The master finds that there was no agreement or understanding between the plaintiff and Wyman that the latter should make any charge to the plaintiff for tanning.

One item of $43,298.64 was charged for tanning leather which Wyman agreed to deliver to purchasers, as Moors's agent, and

the proceeds of which in money he further agreed to deliver to Moors as soon as received, his contract expressly stating that Moors was not to be chargeable with any expense incurred thereon. It will be seen that this agreement follows the form of the original contract of the Boston firm as to letter of credit hides, with such change only as was required by the fact that Wyman received the purchase money for the leather in the first place. We think that the master was plainly right in disallowing this charge.

The remaining item is $36,710.43, being the difference between four cents a pound allowed by the master, and seven cents, the actual cost of tanning. Of this sum, according to the statement of Wyman's counsel, $13,972.89 was for tanning loan account hides, for which the Vanceboro firm agreed that the cost to Moors should not be more than four cents. In the absence of agreement to the contrary, the master was warranted in finding that, as to these hides at least, Wyman proceeded on the terms of the contract, and could not charge more than four cents, if entitled to charge anything. There was nothing to preclude such a finding in the fact that Moors took possession of the bill of lading hides arriving after the failure. He had a right to do so, and if he had not had the right, we could not say, as matter of law or fact, that his doing so imported a repudiation of the distinct contract relations as to the loan account hides in the tannery.

There is left, then, only $22,737.54 in dispute, which might be deducted from the amount in Wyman's hands and yet leave enough to pay the plaintiff. As to this sum, we think that the allowance of four cents was sufficiently favorable to the defendants, and, if it were necessary to go further in order to secure the plaintiff's rights, we should have some difficulty in finding a warrant for making any allowance at all. The hides were bill of lading hides, which by the original agreement were to be manufactured into leather without any expense to Moors or the Bank. Such bill of lading hides as Wyman did make an agreement about, he undertook to deal with in the same way. On these facts alone the argument against his right to charge is strong. But, further, bearing in mind that these hides were to be tanned and held by the Boston firm, and that the Vanceboro firm had nothing to do with them, if that fact be material, it is to be

observed that where the holder of the equity of redemption in property, or of a kindred interest, makes improvements upon it necessary to preserve it from destruction or great loss, he may be presumed to make such improvements in the interest of the equity, for the purpose of at least diminishing the claim upon his general funds not pledged, and, if possible, of obtaining a surplus. Undoubtedly, it was for the interest of the creditors of the Boston firm that the hides should be tanned rather than be spoiled. The principle is the converse of that which allows a mortgagee to charge for reasonable improvements. *Merriam* v. *Goss*, 139 Mass. 77, 82. There are obvious objections to allowing the holder of the equity to create a lien superior to an existing mortgage. Even if the Vanceboro firm were concerned, it would not necessarily change our opinion upon the matter, in view of the circumstances of this case.

*Decree accordingly.*

*R. M. Morse, Jr.*, for the plaintiff.

*E. R. Hoar & Samuel Hoar*, for the defendant Wyman.

*J. C. Lane*, for the defendants Shaw.