JOSEPH B. MOORS & another *vs.* CHARLES S. BIRD.

Suffolk. November 17, 20, 1905. — February 28, 1906.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Sale. Bills of Lading. Contract. Mistake. Payment.*

Where a banker advances to an importer the purchase money for goods on drafts under a commercial letter of credit which requires that the goods shall be shipped to this country with bills of lading to the order of the banker, one copy to be sent to the banker direct by vessel or mail, the banker becomes the owner of the goods.

A banker, who has acquired the title to merchandise imported from a foreign country by advancing the purchase money under a letter of credit on drafts accompanied by bills of lading of the merchandise to his order, does not lose this title by indorsing the bills of lading to the importer and permitting the goods to be delivered to him under a trust receipt by which the importer agrees to hold the merchandise in trust or on storage as the property of the banker with liberty to sell and deliver the merchandise to a certain firm on account of the banker and to deliver to the banker the proceeds of any sale of the merchandise, to be applied by the banker in the first place to the payment of any drafts or acceptances under the letter of credit and secondly to the payment of any other indebtedness of the importer to the banker.

An importer of paper stock agreed with a paper manufacturer to sell him imported merchandise for the actual cost of the merchandise to the importer and the sum of one dollar per ton. To enable the importer to carry out this contract, and with the knowledge of the manufacturer, a banker advanced the money to pay for the imported merchandise on drafts under a commercial letter of credit accompanied by bills of lading of the merchandise to the order of the banker, whereby he became the owner of the merchandise. He indorsed the bills of lading to the importer in exchange for trust receipts by which the importer agreed to hold the merchandise in trust or in storage as the property of the banker with liberty to sell and deliver the merchandise to the manufacturer and pay the proceeds to the banker. The arrangements between the importer and the banker were known to the manufacturer, and the terms of the contract between the importer and the manufacturer were known to the banker. Under this contract merchandise was delivered by the importer to the manufacturer who paid what he believed to be the price under the contract directly to the banker. Unknown to the banker and the manufacturer the importer fraudulently had made a secret arrangement with the seller of the merchandise in a foreign country by which the seller added to the invoice price fictitious freight charges greater than the actual freight charges to be paid by the importer. This caused the payments for the merchandise made by the manufacturer to the banker to be greater than they should have been under the terms of the contract between the importer and the manufacturer. In ignorance of the fraud, the banker after deducting the amount of his advances and expenses turned over the balance of the purchase money to the importer, or credited him with it in a settlement of accounts. *Held,* that the merchandise

delivered by the importer to the manufacturer was sold by its owner, the banker, to the manufacturer under an oral agreement on the terms of the contract between the importer and the manufacturer, that the manufacturer, having paid to the banker the wrongful freight charges in excess of the amount due under that contract, could recover from the banker the amount of such excess as money paid under a mistake of fact, and that the fact that the banker had paid the money to the importer or had credited it to him in a settlement of accounts was no defence.

If a person to whom money is payable asks the person paying the money to pay it to one of his creditors instead of to himself, and this is done, the payment in legal effect is made, not to the creditor who receives the money, but to the debtor at whose request and for whose benefit it is paid, and the creditor who receives the money incurs no obligation to the person from whose hands he receives it.

CONTRACT for $7,000. Writ dated September 15, 1902.

The defendant filed an answer containing a general denial, and the following declaration in set-off:

" The defendant says that he is a manufacturer of paper and the firm of Horace Dutton and Company, hereinafter mentioned, doing business in Boston and in England, were previous to January 1, 1898, and up to the date of the writ dealers in paper stock.

" That previous to the year 1898, the defendant entered into a contract with Horace Dutton and Company, by which Horace Dutton and Company agreed to sell to him paper stock of various kinds used in the business of the defendant, at a price to be determined by adding to the actual price paid by Horace Dutton and Company in the foreign market for such stock, the amount of their office expenses incurred in making such purchases for the defendant, the actual freight, if any, paid by them on merchandise sold to the defendant, and the wharfage, insurance, and banker's commission on such goods, and a sum of one dollar per ton of 2240 pounds. That said merchandise was purchased by Horace Dutton and Company in the foreign market, with the proceeds of drafts drawn under a letter of credit issued by the plaintiffs and that the merchandise so purchased was held by the plaintiffs, either as collateral or as their own property, to secure them for payments made by them in taking up such drafts.

" That such merchandise was delivered by the plaintiffs to Horace Dutton and Company under trust receipts, with authority to sell the same to the defendant for account of the plaintiffs;

that the merchandise delivered to Horace Dutton and Company under such trust receipts was immediately delivered by them to the defendant, with instructions to pay for the same to the plaintiffs, and accompanied by a bill for the same from the plaintiffs. That the defendant paid for a large amount of merchandise in this manner. That about August, 1900, the defendant discovered that Horace Dutton and Company and the plaintiffs had charged the defendant for such merchandise paid for by him more than was actually due for the same, and that he had therefore paid more than was actually due for the same, believing that the bills were correct, by the sum of $7,000.

" Wherefore, he prays that such overcharge may be set off against the claim of the plaintiffs, if any."

In the Superior Court the case was submitted upon an agreed statement of facts, and that court ordered judgment *pro forma* for the defendant. The plaintiffs appealed.

The agreed facts were as follows:

The plaintiffs, J. B. Moors and Company, are bankers doing business in the city of Boston. The defendant, doing business as F. W. Bird and Son, is a paper manufacturer in Walpole, Massachusetts. The firm of Dutton and Company, at the time of the transactions hereafter described, were importers of paper stock, doing business in Boston. Since about 1888 Dutton and Company have been carrying on business with Bird and Son, selling to the latter paper stock, bought in Europe and imported into this country.

At some time before November 1, 1897, it was agreed between Bird and Son and Dutton and Company that the price to be paid by Bird and Son for all imported merchandise sold to them by Dutton and Company should be the sum of the actual cost of the merchandise to Dutton and Company, the cost of cables and office expenses, agreed to be four per cent of purchase, the bankers' commission, agreed to be one and one quarter per cent, insurance and wharfage, and the sum of one dollar per ton of two thousand pounds.

Dutton and Company had a house in London and a house in Boston. Purchases of merchandise were made by the London house in France, terms, delivered in Boston, freight prepaid; and such merchandise, when delivered to Bird and Son, was

invoiced to them at a price determined by adding the expenses and other items above set forth to the amount at which the merchandise was invoiced to Dutton and Company by the seller in France. Bird and Son made all payments for such invoices in ignorance of the facts set forth in the next paragraph.

Without the knowledge of Bird and Son or Moors and Company, Dutton and Company made an arrangement with the seller of such merchandise in France, whereby the latter secretly allowed Dutton and Company, for the freight to Boston, the sum of sixteen shillings per ton, to be deducted from the purchase price as shown by the invoice. Dutton and Company then arranged with the carriers for a rate which varied from ten to thirteen shillings per ton. It is agreed, for the purposes of this case, that the difference between sixteen shillings per ton, allowed by the seller in France for freight as aforesaid, and the amount actually paid for freight, amounted, from November 1, 1897, to August 1, 1900, to the sum of $7,000. The amount of this difference on the bills remaining unpaid on August 1, 1900, is hereafter stated.

To enable them to carry on the business of importing paper stock and selling it to Bird and Son and their other customers, Dutton and Company requested and obtained from time to time the issue to them by Moors and Company, of mercantile or commercial letters, all in a similar form hereafter printed. Under these letters of credit drafts were drawn by Dutton and Company upon the London correspondent bankers of Moors and Company and accepted by the correspondent bankers. These drafts were discounted by Dutton and Company and the proceeds used to pay for the merchandise, and the drafts were paid by the correspondent bankers out of funds provided for that purpose by Moors and Company. Accompanying the drafts were invoices made by the seller in France and sworn to before the United States consul, and bills of lading made out to the order of Moors and Company, covering the merchandise purchased, and such invoices and bills of lading were forwarded by mail to Moors and Company and held by them until the arrival of the merchandise in Boston. After such arrival Moors and Company indorsed the bills of lading and delivered them and the consular invoices to Dutton and Company, and at the same time

took in exchange therefor trust receipts, all in a similar form hereafter printed. Dutton and Company then shipped the merchandise to Bird and Son and, in accordance with the terms of the trust receipts, handed to Moors and Company invoices to Bird and Son of the merchandise so shipped, and Moors and Company sent these invoices to Bird and Son, enclosed in letters. The price named in the invoices was a price fixed by Dutton and Company, believed by Bird and Son to have been fixed in the manner agreed between them.

In pursuance of the foregoing method, payments for the merchandise imported by Dutton and Company and sold to Bird and Son were, in all cases, made directly to Moors and Company.

On or about August 1, 1900, Bird and Son discovered that Dutton and Company were making a profit on the freight charges, in the manner explained above, and immediately notified Dutton and Company and Moors and Company that they should decline to pay for merchandise delivered any more than the amount contracted to be paid by them, and that they should reserve from the amount then due for merchandise already delivered a sufficient sum to cover the overcharges on invoices paid and unpaid.

At this time there were outstanding and unpaid the bills for paper stock sold by Dutton and Company, or Moors and Company, if they are to be regarded as sellers, to Bird and Son under the method of doing business above described, amounting to $19,846.98.

The amount of the difference between sixteen shillings per ton and the amount of freight actually paid by Horace Dutton and Company on the above bills was $264.07.

All bills for merchandise before those outstanding had been paid in full by Bird and Son to Moors and Company, and had been credited to Dutton and Company on their account with Moors and Company.

On August 20, 1900, Bird and Son paid, on account of the bills mentioned above, $5,000, and on September 14, 1900, the further sum of $7,846.98, retaining, and stating that they would retain, the sum of $7,000, which they claimed by reason of the facts above set forth, and which they have retained.

Until the notice given by Bird and Son in August, 1900,

Moors and Company had no knowledge of the agreement between Bird and Son and Dutton and Company, as to the price to be paid by the former for imported merchandise sold by the latter. The allowance of sixteen shillings per ton above mentioned for freight, and the deduction thereof from the invoice price to Dutton and Company, did not appear in any of the papers, accounts or dealings of which Moors and Company or Bird and Son had knowledge.

Dutton and Company imported, under letters of credit issued by Moors and Company, merchandise other than that sold to Bird and Son, and the latter was but a small portion of the entire amount so imported.

The business between Bird and Son and Dutton and Company was entirely carried on through Moors and Company as bankers, and Bird and Son were entirely familiar with the nature of Moors and Company's relation to such business and with the course of dealings between Moors and Company and Dutton and Company.

Before 1894 Dutton and Company had become indebted to Bird and Son. On December 29, 1899, at the request of Dutton and Company and of Bird and Son, the plaintiffs, Moors and Company, examined the condition of their entire account with Dutton and Company, and found that the unpaid invoices payable to them from Bird and Son, and from the other customers of Dutton and Company, together with certain merchandise on hand, amounted to more than enough, when collected, by the sum of $4,080.81, to provide funds to meet all the drafts accepted by their correspondents in London under outstanding letters of credit, issued to Dutton and Company. Of the invoices then payable to Moors and Company, on the account of Dutton and Company, there were $33,414.93 due from Bird and Son, which Moors and Company considered and assumed to be good, without deduction. Relying upon this showing of the account, Moors and Company on the following day, at the request of Dutton and Company and of Bird and Son, paid over to the latter the sum of $3,858.27, in liquidation of an indebtedness of Dutton and Company to Bird and Son, incurred before 1894.

For the purposes of this case, it is agreed that on December 29, 1899, the amount of the difference in freight charges be-

tween sixteen shillings per ton and the amount actually paid by Dutton and Company, in the manner aforesaid, was in excess of $4,080.81; also that taking the amount shown on Moors and Company's account with Dutton and Company, as due from Bird and Son to be good for its face, Dutton and Company, on August 1, 1900, owed Moors and Company $324,52, and on September 15, 1902, the date of the writ, $4,075.94.

Between November 1, 1897, and August 1, 1900, Moors and Company, relying upon the state of the account with Dutton and Company, as shown on Moors and Company's books, made payments of cash to Dutton and Company from time to time on general account exceeding in the aggregate the sum of $7,000; and after August 1, 1900, and before the date of the writ, made payments to Dutton and Company on general account at various times aggregating the sum of $4,149.26. After August 1, 1900, and before the date of the writ, Dutton and Company closed their Boston office and ceased to do business.

The following is one of the letters of credit:

" J. B. Moors & Co.
" Letter of Credit.
" No. 1423k.
"Boston, Nov. 29th, 1897.
" Messrs. Horace Dutton & Co., Boston, Mass., & London, Eng.'
" Dear Sirs : — We hereby authorize you or such Parties as you may direct to value on Messrs. Kleinwort, Sons & Co. of London, at four months' date for any sum or sums not exceeding in all three thousand pounds sterling, say, £3,000 sterling, for account of yourselves.

" Drafts, with advice thereof to Messrs. Kleinwort, Sons & Co. to be drawn in Europe, and negotiated prior to May 1st, 1898, for the invoice cost of merchandise to be shipped to the Port of Boston, New York, or Philadelphia, in the United States, or Montreal, Canada, and to be accompanied by Consular Invoice and Bills of Lading to our order, one copy to be sent us direct by vessel or mail.

" Proper insurance to be effected in Boston, by yourselves.

" We hereby agree with the drawers, indorsers and bona fide holders of Bills drawn under and in compliance with the terms

of this credit that the same shall be duly honored upon presentation at the office of Messrs. Kleinwort, Sons & Co. in London.

"Please sign Bills as drawn under Credit No. 1423k, dated Boston, Nov. 29th, 1897.

"Yours very respectfully,

"J. B. Moors & Co."

The following is one of the trust receipts:

"82

20-9-24-03

| Amount | No. of Credit | Due in London | Due in Boston |
|--------|---------------|---------------|---------------|
| £59 9/3 | 2681k | April 9, 1901 | Mar. 25, 1901 |

"Boston, Dec. 18, 1900.

"Received from J. Moors & Co., Boston, acting on behalf of Kleinwort, Sons & Co., London, and themselves, the following-described Merchandise belonging to them, specified in Bill of Lading, per S. S. Michigan, dated Liverpool, Dec. 5, 1900, viz: —

⟨B⟩ 1/152 One hundred fifty-two Bales Waste Paper, which we hereby agree to hold in trust or on storage as their property with proper insurance which shall be paid to them in case of loss, but with liberty to sell and deliver said Merchandise to F. W. Bird & Son, for account of said J. B. Moors & Co., and we further hereby agree to deliver to the said J. B. Moors & Co., or Kleinwort, Sons & Co., the proceeds of any sale of said Merchandise, (whether in notes or cash, or other Merchandise,) the same to be applied by them, in the first place toward the payment of any drafts or acceptances under Letter of Credit No. 2681k issued by them for our account, and secondly to the payment of any other indebtedness from us to the said J. B. Moors & Co., with the further understanding that neither the said J. B. Moors & Co., nor said Kleinwort, Sons & Co., are to be chargeable with any expense incurred on said Merchandise: — the intention of this ageeement being to protect and preserve unimpaired the title and ownership of said J. B. Moors & Co., or said Kleinwort, Sons & Co., in said Merchandise and the proceeds thereof.

" With the understanding that the merchandise is to be billed by us, but bill made payable to J. B. Moors & Co., we further hereby agreeing to forthwith hand J. B. Moors & Co. said bill.

"Horace Dutton & Co."

The following, taken from the plaintiffs' brief, is the contention of the plaintiffs referred to in the last paragraph of the opinion:

"If the defendant is entitled to reimburse himself for the payments which he contends that he made under a mistake of fact, the plaintiffs must, on similar reasoning, be entitled to recover the sum of $3858.27, with interest, as claimed in the second count of their declaration. This sum was paid by the plaintiffs to the defendant, at the request of the defendant and of Dutton and Company under a mistake of fact similar to the mistake under which the defendant contends that his payments to the plaintiffs were made. When they made the payment of $3858.27, the plaintiffs believed that the amounts theretofore paid to them by the defendant were correct, and they relied upon the state of the account, as determined by these payments, when they made the payment of $3858.27." See page 405.

*G. D. Burrage (N. B. Vanderhoof* with him,) for the plaintiffs.
*C. K. Cobb,* for the defendant.

LORING, J. It is settled in this Commonwealth that a banker gets the title to goods bought under such a commercial letter of credit as that now in question, *Moors* v. *Drury,* 186 Mass. 424, and cases there cited, and that that title is not lost by a delivery of the goods under such a trust receipt as that which we have here. *Moors* v. *Wyman,* 146 Mass. 60.

The delivery by Dutton and Company of the paper stock in question to the defendant created a sale by the plaintiffs to the defendant on the terms of the original contract between Dutton and Company and the defendant, as in *Plunger Elevator Co.* v. *Day,* 184 Mass. 130, and *American Electrical Works* v. *New England Electric Railroad Construction Co.* 186 Mass. 546.

The defendant paid to the plaintiffs more than the amount due under that contract when he paid the alleged freight in place of the true freight. And the money so paid is without question money paid under a mistake of fact.

These payments made by the defendant were in legal effect payments to the plaintiffs and not payments in legal effect to Dutton and Company made at their request to the plaintiffs, as was the case in *Merchants' Ins. Co.* v. *Abbott*, 131 Mass. 397.

The defendant's counsel has contended with much earnestness that this overpayment can be recovered back from the plaintiffs because Dutton and Company acted as their (the plaintiffs') agents in selling the goods to him, and Dutton and Company's fraud is for that reason in legal effect the fraud of the plaintiffs. However that may be in a case where the importer holding the goods of the banker under a trust receipt sells to a stranger, it is at least doubtful whether the importer acts as the agent of the banker in delivering goods which have been bought under a letter of credit issued to the importer to enable the importer to carry out a previous contract by which the importer was to import goods for his customer and the customer takes the goods in pursuance of that contract, knowing all the relations of the several parties.

We are however of opinion that the second ground is well taken on which the defendant contends that he is entitled to recover back from these plaintiffs the money paid by him under this mistake of fact. As we have said, the overpayments were made to the plaintiffs. The defendant has a right to have them back from the plaintiffs unless he has lost that right by the fact that the plaintiffs have settled their account with Dutton and Company, and have paid to them these and all other sums due to them.

It is settled in England that where money is received under a mistake of fact it is no defence that the money has been paid over to another unless the defendant who received the money was a mere agent of that other person, that is to say, unless the payment was in legal effect a payment to the other person. *Newall* v. *Tomlinson*, L. R. 6 C. P. 405. *Continental Caoutchouc Co.* v. *Kleinwort*, 8 Com. Cas. 277; *S. C.* on appeal, 9 Com. Cas. 240. See also in that connection *Durrant* v. *Ecclesiastical Commissioners*, 6 Q. B. D. 234. There are similar decisions in Rhode Island and Missouri; *Phetteplace* v. *Bucklin*, 18 R. I. 297; *Koontz* v. *Central National Bank*, 51 Mo. 275; and the law seems to be the same in New York; *Kingston Bank* v. *Eltinge*, 40 N. Y. 391; *Corn*

*Exchange Bank* v. *Nassau Bank*, 91 N. Y. 74. The person who receives money under a mistake of fact must pay it back in spite of the fact that he has paid it over to one who would have been entitled to it had the money been what it was supposed to be and that payment over was made in ignorance of the mistake under which the money was paid, provided that, as between the person to whom the payment was made and the person to whom he paid it over, the person to whom the payment was made had a right, in case the state of the accounts between them required it, to keep the money in repayment of advances made, for example, to the other person. In such a case the windfall which came from receiving the money paid under a mistake of fact is, in part at least, his windfall, and he must give it back although in fact all paid over, because the state of accounts did not in fact give him a right to any of it. The test is the right to keep the money if the state of the account required it. The actual state of the account is of no consequence.

In the case at bar the money paid by the defendant to the plaintiffs was the money of the plaintiffs. It is not even money received as the money of Dutton and Company on which the plaintiffs had a lien, as was the case in *Newall* v. *Tomlinson* and *Continental Caoutchouc Co.* v. *Kleinwort, ubi supra.* All that Dutton and Company had was a contract right to the balance of account after the plaintiffs had been paid all due to them under the letters of credit.

For these reasons we are of opinion that the defendant has a right to recoup the $7,000 of previous overpayments.

We are also of opinion that the plaintiffs have no right to reimburse themselves for the payment of the $3,858.27. That was in legal effect a payment to Dutton and Company and not to the defendant, and comes within *Merchants' Ins. Co.* v. *Abbott*, 131 Mass. 397.

*Judgment for the defendant affirmed.*