In re CINCINNATI IRON STORE CO.

BEISER v. WESTERN GERMAN BANK.

(Circuit Court of Appeals, Sixth Circuit. February 22, 1909.)

Nos. 1838, 1839.

1. CORPORATIONS (§ 413*)—REPRESENTATION BY OFFICERS—GIVING SECURITY FOR BORROWED MONEY.

The borrowing of money and giving security therefor by a corporation by its president, who was also a director and the largest stockholder, with the approval of an advisory committee created by the board of directors, who had knowledge of the general custom to make such loans and give such security, was by the implied authority of the directors, and the security so given is valid as against the corporation and its trustee in bankruptcy.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1648; Dec. Dig. § 413.*]

2. ASSIGNMENTS (§ 12*)—VALIDITY—FUTURE EARNINGS UNDER EXISTING CONTRACTS.

A bridge company, engaged in building bridges under contract, from time to time borrowed money from a bank for use in its business, for which it would give the bank a note and also a written assignment of the money to become due under a particular contract described, which assignments were entered on the company's books. The contracts were retained by the company, which made the collections thereon, the debtors not being notified of the assignments. At the time of the bankruptcy of the company the bank held a number of such assignments, and the company had collected payments thereon, which it had not paid over to the bank but used in its business; but other payments remained unpaid. Held, that the assignments were valid between the parties as to such payments, and as against the company's trustee in bankruptcy, who represented only general creditors.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. § 20; Dec. Dig. § 12.*]

3. PLEDGES (§ 11*)—VALIDITY—DELIVERY OF POSSESSION.

A bridge company borrowed money from a bank, and as security for its repayment pledged a quantity of structural iron then in its possession. The pledged iron was set apart in piles on the company's premises, and the piles were marked by numbers and taken possession of by a designated employé of the company as agent for the bank, who issued a receipt therefor as such agent. The transaction was in good faith, and the piles remained intact until the company was adjudged a bankrupt. Held, that there was sufficient delivery to pass the property, and that the pledge was valid.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 31–35; Dec. Dig. § 11.*]

Appeal from the District Court of the United States for the Southern District of Ohio.

C. W. Baker and H. C. Busch, for appellant.
F. H. Shaffer and H. D. Peck, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and KNAPPEN, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

KNAPPEN, District Judge. The Brackett Bridge Company, an Ohio corporation doing business at Glendale, Ohio, was adjudged bankrupt July 3, 1906. The Western German Bank claimed and was allowed preferential liens, under alleged equitable assignments from the bridge company, of payments to be made under construction contracts made by the bridge company with various parties, as well as upon a quantity of structural iron pledged by the bridge company to the bank. The case is brought to this court under both the appellate and revisory authority conferred by the bankrupt act. The fact that both remedies are invoked makes it unnecessary to consider which is, under the circumstances, the proper remedy, a subject which will be found discussed in various decisions of this court, from Cunningham v. German Ins. Bank, 103 Fed. 932, 935, 43 C. C. A. 377, to In re Doran, 154 Fed. 467, 468, 83 C. C. A. 265. No attack is here made upon the validity of the indebtedness claimed to be secured by the liens in question. The assault is made upon the validity of the assignments of the payments made under construction contracts, as well as of the pledge of the structural iron. The grounds of this assault will appear as the opinion progresses.

1. The first asserted ground of invalidity of the assignments and pledge is that they were not authorized by the board of directors. It is not alleged that the giving of these securities was beyond the authority of the corporation. On the other hand, it is expressly conceded in the briefs of counsel for the trustee that the corporation had the power to give the security. The notes containing the collateral assignments were signed on behalf of the bridge company by F. J. P. Brackett, president, and George A. Brackett, secretary, at least two of the notes being signed also by the members of the advisory committee hereafter referred to. The first of the assignments was made April 6, 1904. Others, either originals or renewals, were given from time to time until shortly before the bankruptcy. The president owned a very large majority of the common stock of the corporation, and was the practical bridge manufacturer and the general manager of the corporation. For several years before the bankruptcy, including the entire period covered by the securities in question, the president had been allowed practical charge of all the financial business of the company, including the borrowing of money, except that in 1903 the board of directors, by resolution, created a so-called advisory board "for the purpose of considering and passing on all contracts aggregating $5,000.00 or more and such other business of the company as might come before it." This board consisted of the president and two other members. There was but one director in addition to these three and the secretary.

The method of raising money upon the securities was this: When the bridge company had a contract for the carrying out of which money was needed, it presented to the bank with its application for loan an assignment of the payments to be made under the contract. The money was loaned upon the strength of the assignment, passed to the credit of the bridge company, and by it checked out in the regular and lawful transaction of its business and for its direct benefit. The testimony is express and uncontradicted that the members of the

advisory committee were familiar with the transactions in question, and that the notes and assignments were made after consultation with them. As already said, some of the collateral notes in question were actually signed by all the members of the advisory committee. It clearly appears that by the acquiescence of the directors and stockholders, and through the creation of the advisory board, the president, with the advice and assistance of that board, throughout the entire period covered by the securities in question assumed and exercised the functions of the board of directors with respect to the making of loans and the giving of securities, and that the directors knew of, and, at least impliedly approved, the general course of dealing on the part of the officers and the advisory board with respect to the borrowing of money at the bank and the giving of security therefor. The borrowing of the money upon the pledge of the structural iron was made in the same general way as that loaned upon the assignments of payments under construction contracts. The assignments and pledge in question had thus the implied, if not the express, approval of the board of directors of the bridge company, and the transactions in question were necessary to the operation of the business of that company. In these circumstances, the action of the officers in giving the assignments and pledge in question was as binding upon the corporation as if such action had been authorized by express resolution of the board of directors. Preston Nat. Bank v. Purifier Co., 84 Mich. 364, 381, 47 N. W. 502; Cunningham v. German Ins. Bank, 101 Fed. 977, 980, 981, 41 C. C. A. 609; Mining Co. v. Anglo-California Bank, 104 U. S. 192, 194, 26 L. Ed. 707; Sun Printing, etc., Ass'n v. Moore, 183 U. S. 642, 650, 22 Sup. Ct. 240, 46 L. Ed. 366; Sherman v. Fitch, 98 Mass. 59. The securities being valid against the corporation, so that it is estopped to deny their validity, the trustee in bankruptcy is equally estopped, as the trustee is vested with no better title to the bankrupt's property than the bankrupt itself possessed at the time it passed to the trustee. York Manfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782. It must be held that the securities were issued by due authority.

2. The validity of the assignments of the payments under the construction contracts is assailed as being void as to creditors represented by the trustee: first, as being secret and unknown to other creditors of the bankrupt; second, for the reason that the assignor (the bridge company) retained (as alleged) full dominion and control over the assigned claims; third, that the alleged assignments are mere promises to pay out of the moneys obtained under the construction contracts; fourth, that no notice of the fact of the assignment was given to the debtors under the assigned contracts; and, fifth, that, if the assignments are valid at all, they are so valid only to the extent of the particular payments specified, and that such specified and assigned payments had been before the bankruptcy collected by the bridge company, leaving nothing for the assignment to operate upon.

The facts necessary to an understanding of these objections are these: As security for the payment of each loan, the bridge company gave a note reciting the assignment as security, together with a separate instrument of assignment. The forms used in each case were

the same, except in one particular hereafter mentioned. That used in connection with the loan on account of the Elizabethtown bridge is thus (with the exception noted) sufficiently illustrative. The note in that case contained this clause:

"Having deposited or pledged as collateral security for the payment of this note, No. 1769, Hamilton county, Ohio, for $119,500.00 for the construction of Elizabethtown bridge"

—this clause being followed by a power of sale; the assignment being in this language:

"In consideration of $15,000.00 loan made to us this day by the Western German Bank, Cincinnati, Ohio, for four months, we hereby transfer to them our claim as follows—in course of construction at our factory or in the course of erection, contract No. 1769, Hamilton county, Ohio, $119,500.00; said loan to be paid out of the first money received on said claim and as received, except the first estimate."

The exception above noted is that in each of the other assignments the words "except the first estimate" are omitted. In the case of each loan the assignment was entered in full upon the books of the bridge company, and, in advance of the payment over of the money, was given to the bank with a notarial certificate attached that "the above is a true and correct copy of the entry as made this day on the books of the Brackett Bridge Company, Cincinnati, Ohio." This assignment was not filed or recorded in any public office. The bank did not keep the assignments "secret," except in the sense that they were not made public. The bridge company retained possession of the contract, and payments were made directly to it, the debtors under the construction contracts not being notified of the assignment. The bank had obviously the power to make the collections itself, had it desired to do so. The bridge company was under obligation to turn over to the bank all payments made as fast as collected. The bank expected that such course would be taken. In fact, the greater part of the payments made up to the time of the bankruptcy had been retained by the bridge company, and used in the regular transaction of its business. Large amounts, however, still remained unpaid upon the contracts in question, and it is upon these unpaid amounts that the lien of the bank was claimed and allowed. The trustee represents only general creditors, none claiming preferential liens, and none having fastened or attempted to fasten upon the property in question by attachment or other special proceeding. The action of the bank in making the loans, and in its treatment of the security, is shown to have been in good faith and with the design only of protecting its own interests in connection with the loans.

It should be noted that no question of preference under the bankrupt act is involved, it being conceded that all the preferences claimed were made more than four months before bankruptcy intervened. The subject of the validity of an assignment of the nature of those in question here is not in Ohio regulated by statute, and we are cited to no decisions of the courts of that state declaring an assignment of this nature invalid as between the original parties thereto. The validity of the assignments must therefore depend upon equitable principles applicable to the general law. It may be said, in passing, that

even if the Ohio statutes relating to the recording of mortgages of personal property were held applicable to the case of these assignments, the situation would not be altered, for the reason that under the laws of that state no creditors are entitled to complain of the lack of record except those who have fastened upon the property by some specific lien. Wilson v. Leslie, 20 Ohio, 161; York Manfg. Co. v. Cassell, supra. Inasmuch as the trustee in bankruptcy is vested with no better title than the bankrupt had when the trustee's title accrued, the validity of these assignments must, for the purposes of this inquiry (and in the absence of fraud), be determined by their validity or invalidity as against the bridge company. It is not open to question that under the general law assignments such as those in question, made in good faith, to enable the debtor to raise money for carrying on its business, are valid as against the debtor, notwithstanding no notice was given creditors, and in spite of the fact that the claims assigned remain in the debtor's possession. Preston Nat. Bank v. Purifier Co., supra; Union Trust Co. v. Bulkeley, 150 Fed. 510, 80 C. C. A. 328. There being no fraud, the question of invalidity, as resting upon a lack of notice and of retention of dominion by the assignor, is disposed of by the foregoing considerations.

The assignments in question are not mere promises to pay money. They are assignments of "our claim," and relate to the moneys to be earned by the assignor through the performance of the contract. An assignment of future earnings from personal employment is valid (Rodijkeit v. Andrews, 74 Ohio St. 104, 77 N. E. 747), and, notwithstanding the assignment was of a part only of the moneys to be earned. In Union Trust Co. v. Bulkeley, supra, the assignment which was held valid was of accounts and bills receivable to be thereafter acquired. There is no reason for asserting a different rule as against the assignments of moneys to be earned under a construction contract.

It is not necessary to the validity of the assignments as against the assignor that those liable to pay the claims assigned be notified of the assignment. Thayer v. Daniels, 113 Mass. 129; Marsh v. Garney, 69 N. H. 236, 45 Atl. 745; Copeland v. Manton, 22 Ohio St. 404. No question of lack of notice is raised by the debtors, nor have they been prejudiced by the assertion of rights of other claimants to the fund. The contest is entirely between the assignee and the one standing in the shoes of the assignor.

The proposition that the rights of the bank have been lost by the failure to enforce payment out of the first money received applicable to the payment cannot be sustained. The assignment was not merely of the first money received on the claim: it was of the entire claim, so far as necessary to meet the debt secured. The provision for payment out of the first moneys received was manifestly for the benefit of the bank. If, without surrendering its right to later payments, it failed to receive the earlier payments, the bridge company had no right to object to the enforcement of the lien out of the later payments. There is a lack of satisfactory evidence that the bank ever intentionally relinquished its claim upon the funds assigned. The testimony indicates that the bank supposed it was actually getting the moneys as fast as received. If this is so, the bridge company would

not be permitted to object to the enforcement of the lien as against later payments; but, in the absence of such testimony, it would be inferred, from lack of testimony to the contrary, that the intention of the parties was that the liability should attach to later payments.

The objection that the lien is lost is thus not only without legal sanction, but is without equity, in view of the fact that the bankrupt estate has been benefited by the payments retained by the debtor. In our opinion, the assignments of the moneys arising under construction contracts must be held valid and enforceable.

3. As to the pledge of the structural iron: On February 17, 1906, the bridge company arranged for a loan at the bank of $15,000, to be secured by a pledge of 520 tons of structural iron, viz., 350 tons of I-beams and 170 tons of channels. The bridge company had this material on hand at the time. It accordingly executed a written transfer of the iron in these words:

"In consideration of $15,000.00 advanced to us this day by the Western German Bank, Cincinnati, Ohio, we hereby transfer to them as follows: 350 tons of I-beams as designed and marked lot No. 10, 170 tons of channels as designed and marked lot No. 12, 520 tons at $36.60 per ton, $19,032.00. The above material to be the property of the Western German Bank and to be used only on the payment of the above loan or such portion as paid from time to time."

It then set aside the 350 tons of I-beams in different piles in the yard, and had them marked as lot No. 10. At the same time it set apart 170 tons of channels in different piles, marking them lot No. 12. These lots 10 and 12 were given into the custody of one Greer, a shipping clerk of the bridge company, with instructions to retain the custody on behalf of the bank and to keep the pledged iron intact. He accordingly checked over the piles, found them to aggregate the amounts stated, and gave a receipt reading:

"As warehouse custodian for the Western German Bank, I have this day received from the Brackett Bridge Company 350 tons of I-beams designated as lot No. 10 and 170 tons of channels designated as lot No. 12. Said material is stored on the premises of the Brackett Bridge Company, is to be held intact and to be subject to the order of the Western German Bank."

The assignment was entered upon the stock book of the bridge company, and (accompanied by a notarial certificate of such entry) was delivered to the bank, together with the custodian's receipt, before the money was loaned.

The objections to the validity of this pledge are: First, that it was not made in good faith, but in actual fraud; second, that there was no delivery of the iron, but that the pledgor retained possession and control of the iron and had the right to use it, no notice being given creditors; and, third, that the pledgor actually used the iron and that thus nothing remained for the pledge to attach to.

The evidence satisfies us of the good faith of the transaction. There is testimony tending to show that a portion at least of the pledged iron had been used; also that it had not been kept apart from the other property of the bridge company. There was also testimony of statements to third persons by the president of the bridge company inconsistent with the existence of a pledge of this stock. We are satis-

fied, however (as were evidently the referee and the District Judge), from the testimony on the part of the custodian and others, that the pledged iron was from the time of the making of the pledge until the bankruptcy kept apart from the other material of the bridge company, and retained in the sole custody of the original custodian entirely intact. In our opinion, a valid pledge of this stock was created and maintained as against the bridge company and its trustee in bankruptcy. If actual delivery of the thing pledged is necessary where, as here, the question arises between the pledgee, and one "standing in the shoes of the pledgor," then there must have been such a setting apart of the thing pledged and such change of possession as would preclude the right of the bridge company to control the disposition of and to use the iron without the approval of the bank. The provision in the written transfer relative to use by the bridge company only on payment of the loan in whole or in part, taken in connection with the custody of the iron by the third person, gave the company no right to use the iron without the previous assent of the bank. No such assent was ever given or asked for. A change of possession to the extent of furnishing notice to third persons becomes immaterial, as no rights of such third persons have intervened. The mere fact that the iron was stored on the premises of the pledgor company did not invalidate the pledge, provided the possession was actually changed from the pledgor to the pledgee, and the pledgor's dominion over the property otherwise removed. Love v. Export Storage Co., 143 Fed. 1, 74 C. C. A. 155; Union Trust Co. v. Wilson, 198 U. S. 534, 25 Sup. Ct. 766, 49 L. Ed. 1154. Nor is the fact that the custodian was an employé of the bridge company, and in its sole pay, necessarily inconsistent with his lawfully and effectually acting as the representative of the bank, and with his possession being regarded in law as that of the bank. Sumner v. Hamlet, 12 Pick. (Mass.) 36; Moors v. Wyman, 146 Mass. 60, 15 N. E. 104; Dunn v. Train, 125 Fed. 221, 60 C. C. A. 113. The bank had agreed with the bridge company upon the custodian before the loan was made. The fact that the bank did not meet the custodian personally is immaterial. The rule is that in order to make a pledge valid the delivery must be such as to pass property, and that this rule is satisfied by depositing the pledged articles in any suitable place, provided the pledgee personally or by his representative has the absolute control over them and the right and power to take them away if he pleases. The evidence satisfies us of the fact of actual delivery, and of actual control and dominion by the bank over the pledged property, and with a parting of possession and dominion on the part of the bridge company. Had the latter converted to its own use any of the property in question without the consent of the bank, it would clearly have been liable to an action therefor.

In our opinion, the validity of this pledge is sustained upon well-settled principles, recognized in the authorities above cited. The case presented differs radically from that of Security Warehousing Company v. Hand, 206 U. S. 415, 27 Sup. Ct. 720, 51 L. Ed. 1117, in which case the alleged change of possession was characterized as "a mere pretense, a sham."

The District Court correctly held that the claimant is entitled to the preferential liens claimed, and its order will be affirmed.