INTERNATIONAL TRUST COMPANY *vs.* WEBSTER NATIONAL BANK.

Suffolk. October 22, 23, 1925. — December 8, 1926.

Present: RUGG, C.J., BRALEY, CROSBY, CARROLL, & SANDERSON, JJ.

*Factor's Act. Consignment. Pledge. Trust,* "Trust receipt." *Contract,* Construction. *Words,* "Consignee."

An importer of wool signed and delivered to a trust company, which had guaranteed performance by him of the provisions of a letter of credit issued to him by a national bank, a trust receipt, which was not recorded and under the provisions of which the importer agreed to hold certain wool being shipped to him in trust for the trust company "and as its property, with liberty to manufacture and remanufacture the same without cost or expense to it, and to sell the same for its account . . . to keep said goods, the manufactured product, and the proceeds thereof, whether in the form of moneys or accounts and bills receivable, separate and capable of identification" as the property of the trust company. Thereafter, the importer, in financing the manufacture of the wool into yarn, pledged and mortgaged some of the yarn to a national bank to secure a loan made by that bank to the importer in good faith and without knowledge of the trust receipt or the claim of the trust company. Upon nonpayment of the loan, the bank sold the yarn. *Held,* that the trust company could not maintain an action of tort for conversion against the national bank, the bank having advanced money "on the faith of" a "consignment" under the provisions of G. L. c. 104, § 3.

TORT for conversion of wool yarns. Writ dated March 27, 1923.

In the Superior Court, the action was heard by *Keating,* J., without a jury. Material evidence and rulings by the judge are described in the opinion. There was a finding for the plaintiff in the sum of $21,781.25. The defendant alleged exceptions.

*R. E. Buffum,* (*T. Leboeuf* with him,) for the defendant.

*C. W. Lavers,* for the plaintiff.

CROSBY, J. This is an action of tort brought to recover for the alleged conversion of twenty-five thousand pounds of woolen yarn. The plaintiff and the defendant are banking institutions doing business in this Commonwealth. After the bringing of this action the plaintiff, a trust company organized under the laws of Massachusetts, was converted into a national bank under the name of the International National Bank of Boston, and conveyed to said bank all its assets; thereafter the International National Bank of Boston was consolidated with The First National Bank of Boston, a corporation organized under the national bank act and having its principal place of business in Boston in this Commonwealth, and the assets of the plaintiff became vested in The First National Bank of Boston.

The material facts respecting which the controversy in the present case arises are in substance as follows: on August 7, 1919, one F. N. Graves, who was engaged in the wool business in Boston under the name of F. N. Graves Company, through the plaintiff (with whom he had done business for many years) applied to The First National Bank of Boston for a letter of credit in the sum of $83,000 for the purchase of two hundred and three bales of unscoured wool, known as "greasy wool," to be shipped from Buenos Ayres, South America. The performance of the obligations of Graves to The First National Bank of Boston resulting from the issuance of the letter of credit was guaranteed in writing by the plaintiff as a part of the transaction. See *Nowell* v. *Equitable Trust Co.* 249 Mass. 585. The letter of credit was issued and an indorsed bill of lading covering the wool was delivered to the plaintiff.

On or about September 19, 1919, Graves signed and delivered to the plaintiff a trust receipt covering the wool from which the yarn was afterwards manufactured.   The receipt recited that the wool was the property of the plaintiff; that Graves agreed to hold it in trust for the plaintiff "and as its property, with liberty to manufacture and remanufacture the same without cost or expense to it, and to sell the same for its account . . . to keep said goods, the manufactured product, and the proceeds thereof, whether in the form of moneys or accounts and bills receivable, separate and capable of identification as the property of International Trust Co., of Boston, and . . . in case of sale, to hand the proceeds to said International Trust Co., of Boston, to be applied by it against the acceptances of, on my (our) account, under the terms of Letter of Credit No.   issued for our account, and to the payment of any other indebtedness of mine (ours) to International Trust Co., of Boston, whether then due or not."   The receipt also recited that the plaintiff might cancel the trust at any time and repossess itself of its said property in whatever condition it might then be, or of the proceeds thereof if sold, wherever the same might be found; that Graves should keep the goods fully insured against loss by fire while in his possession; that the insurance money recovered for any loss should be subject to the trust in the same manner as the goods themselves; and it contained other provisions which need not be referred to.

When the trust receipt was delivered to the plaintiff, it indorsed and delivered the bill of lading to Graves, who in turn delivered it to Hartmann Brothers to enable them to obtain the wool for scouring.   A draft for $78,200 was issued by The First National Bank of Boston under the letter of credit; when it became due on December 15, 1919, it was paid by the plaintiff, the latter receiving from Graves an acceptance for $78,800 indorsed by F. N. Graves Company. At no time did the plaintiff have actual physical possession of the wool or the yarn manufactured therefrom.   The trust receipt was not recorded.

Graves entered into an agreement with the Webster Dye & Yarn Mills, Inc. (hereinafter referred to as Webster Mills) to

manufacture the wool into yarn, which would be of much greater value than wool, and to pay the Webster Mills for such conversion. This expense was charged by the Webster Mills to Graves or to "F. N. Graves Company."

When the acceptance for the $78,800 given by Graves to the plaintiff became due, it was cancelled, Graves giving the plaintiff in lieu thereof a promissory note, unsecured in form, for the same amount payable on demand. The dealings between the plaintiff bank and Graves had extended over many years and covered many transactions.

On March 30, 1920, as Graves then owed a substantial amount to the Webster Mills for the manufacture of the yarn, he applied to the defendant bank for a loan of $12,500, and at the same time delivered to it the following writings:

"Mr. Prentis Howard Pres. Webster Nat'l Bank Webster, Mass. Dear sir: We will give you delivery of 25000# yarn all spun at Clinton as collateral against $25,000 loan in your Bank as a drawing account. F. N. GRAVES & Co. Webster Dye & Yarn Mill Webster, Mass. Deliver to Webster Nat'l Bank 25000 # Twenty-five thousand pounds yarn F. N. GRAVES & Co." At the time of the application for this loan Howard (now deceased) was also president of the Webster Mills, and its principal owner. On April 14, 1920, a loan for $12,500 was granted to Graves, who gave to the defendant his collateral promissory note for that amount, which stated that it was secured by twenty-five thousand pounds of woolen yarn. This note was renewed from time to time, the last renewal bearing date of May 12, 1921. It also appeared that on May 26, 1920, Graves gave a mortgage for $10,864 on the twenty-five thousand pounds of yarn to the Webster Mills.

On July 14, 1920, the plaintiff wrote to the Webster Mills as follows: "Gentlemen: In order that we may make certain verifications of collateral held for account of F. N. Graves Company, will you kindly send us detailed statement of wool or yarns held by you, also kindly advise us of any storage or other charges that there may be against same. Thanking you very much for your prompt attention to this matter, we are, Very truly yours, HOWARD NORTON Assistant Secretary."

By letter dated July 15, 1920, the Webster Mills replied in substance that the defendant bank had a $12,500 loan on twenty-five thousand pounds of yarn made by the mills for F. N. Graves, and that the mills had a second mortgage of $10,864 on the same collateral; the letter also stated, "Mr. Graves has in addition approximately 5000 pounds of yarn here unencumbered." On July 20, 1920, Graves paid $30,000 on account of the plaintiff's note of $78,800; the balance of this note is still unpaid.

On November 8, 1921, the plaintiff wrote the Webster Mills as follows: "Dear Sirs: A little over a year ago you advised us that you were holding certain wool and yarn which had been delivered to you by F. N. Graves Company and which had been held for our account. Will you kindly confirm your holdings for this account at the present time and if you have any charges against this wool, please advise. Yours very truly, HOWARD NORTON, Asst. Sec." It does not appear what reply if any was made to this letter. After repeated demands by the defendant on Graves for payment of the $12,500 note, the defendant sold the yarn in different lots between April 1, 1922, and June 1, 1922, for about $12,500, which was its fair market value at the time it was sold. On March 9, 1923, the plaintiff made a written demand on the defendant for the yarn and afterwards brought this action.

The case was tried before a judge of the Superior Court, sitting without a jury, who made certain findings and rulings and found for the plaintiff in the sum of $18,750 as damages, with interest thereon from April 14, 1920, the date of the conversion. All the material evidence is reported.

The defendant contends that, under the trust receipt which authorized Graves to sell the goods for the plaintiff's account, the relation of principal and agent was established; that Graves was a "consignee" or "factor" within the meaning of those words in G. L. c. 104, §§ 3 and 4, as he had possession of the merchandise with authority to sell it for the plaintiff and was therefore its agent for that purpose; and that the defendant had a prior lien on the goods as security for its loan to Graves.

At common law a consignee, factor or agent could not pledge the owner's property for his own debt. *Michigan State Bank* v. *Gardner*, 15 Gray, 362. The consignee of goods for sale does not have authority to pledge them for his own debt. The pledge is void as against the owner. *Nowell* v. *Pratt*, 5 Cush. 111. Although this court has not heretofore been called upon to consider the rights of a holder of a trust receipt as against one who in good faith and without notice subsequently has loaned money to an importer or other person, yet the character of such a receipt and the rights of the holder thereof generally have been considered and defined.

G. L. c. 104 is entitled "Agents, Consignees and Factors." It was originally enacted in substantially its present form by St. 1849, c. 216. A pertinent section is as follows: "Section 3. If a person intrusted with merchandise has authority to sell or consign the same, a consignee to whom he consigns it shall have a lien thereon for any money or merchandise advanced or for any negotiable security given by him on the faith of such consignment, to or for the use of the person in whose name the consignment or delivery was made, and for any money, negotiable security or merchandise received for the use of such consignee by the person in whose name the consignment or delivery was made, if such consignee had, at the time of such advance or receipt, probable cause to believe that the person in whose name the merchandise was shipped, transmitted or delivered was the actual owner thereof or had a legal interest therein to the amount of said lien."

The purpose of the act as stated in *H. A. Prentice Co.* v. *Page*, 164 Mass. 276, at page 281, was "to protect parties dealing in good faith with factors or agents who have been intrusted with goods or merchandise for sale or consignment."

At the outset the question arises whether the defendant was a "consignee" to whom Graves consigned the merchandise for money advanced. We construe the word "consignee" as meaning one to whom merchandise has been delivered. A "consignee" is defined as a person to whom goods or other property sent by a carrier are consigned or

addressed; specifically, one who has the care or disposal of goods received on consignment; a factor. See *Block* v. *Columbian Ins. Co.* 42 N. Y. 393, 403; *Ryttenberg* v. *Schefer*, 131 Fed. Rep. 313, 321. It cannot be doubted that under § 3 Graves was a person intrusted with the merchandise with authority to sell the same, and that he delivered it to the defendant who advanced money "on the faith of such consignment." The record shows that at the time of the delivery the defendant made the loan to Graves in good faith without knowledge of the trust receipt or of the plaintiff's claim. It was said by Chief Justice Field in *Cairns* v. *Page*, 165 Mass. 552, at page 554, that "The language of the Pub. Sts. c. 71, § 3, is very broad, and includes any person intrusted with merchandise, and having authority to sell or consign the same." The language of this section, while somewhat different from the statute in its present form (G. L. c. 104, § 3), was not changed in meaning or effect by the present statute. *Main* v. *County of Plymouth*, 223 Mass. 66, 69.

Graves was expressly authorized by the plaintiff to sell the wool or manufactured yarn for the plaintiff's account. The right to manufacture the wool and convert it into yarn, did not render the statute inapplicable.

The express and general authority given him to sell distinguishes the case from *Thacher* v. *Moors*, 134 Mass. 156, *H. A. Prentice Co.* v. *Page, supra, Boston Supply Co.* v. *Rubin*, 214 Mass. 217, 220, and other cases relied on by the plaintiff where there was no such authority to sell.

The conclusion reached by us is in harmony with cases which have arisen under the factors act in force in the State of New York. (Laws of New York, 1830, c. 179.) The New York statute is similar to ours although passed at an earlier date, both acts being modelled somewhat upon the English acts of 1823 (4 George IV, cc. 83, 94), but different from them in essential particulars. The third section of the New York act provides in part that "Every factor or other agent, entrusted with the possession of any bill of lading . . . for the delivery of any such merchandize . . . for the purpose of sale, or as a security for any advances to be made or obtained thereon, shall be deemed to be the true

owner thereof, so far as to give validity to any contract made by such agent with any other person . . . for any money advanced, or negotiable instrument or other obligation in writing given by such other person upon the faith thereof."

It was held in *Blydenstein* v. *New York Security & Trust Co.* 67 Fed. Rep. 469, that the factors act of New York applied to the relationship created by a trust receipt, and that a *bona fide* pledgee from one intrusted with the possession of merchandise with a power of sale was protected against the owner of the title under a trust receipt. This decision was followed by the Court of Appeals of New York in a case where the language of the trust receipt was substantially the same as in the case at bar. *New York Security & Trust Co.* v. *Lipman*, 157 N. Y. 551.

In *Freudenheim* v. *Gütter*, 201 N. Y. 94, where the effect of the factors act of the State was considered, it was said at page 100: "It [the act] . . . made possession, under certain circumstances, conclusive evidence of ownership to the extent necessary to protect a purchaser or a lender who acted in good faith and without notice. It thus shifted the loss caused by the fraudulent act of the agent from the innocent purchaser to the principal who selected the agent, intrusted him with possession of the property and placed him in a position where he could perpetrate the fraud. . . . The real theory of the act is that the selection of the faithless agent and intrusting him with the property is the cause of the loss and, hence, that loss is placed not upon the third party who is wholly innocent, but upon the owner, because by appointing and trusting a dishonest agent he brought about the loss." See also *Foreign Trade Banking Corp.* v. *Gerseta Corp.* 237 N. Y. 265. *Glass* v. *Continental Guaranty Corp.* 81 Fla. 687.

None of the cases heretofore decided by this court, including *Moors* v. *Wyman*, 146 Mass. 60, *Peoples National Bank* v. *Mulholland*, 224 Mass. 448; *S. C.* 228 Mass. 152, *Brown* v. *Green & Hickey Leather Co.* 244 Mass. 168, and *T. D. Downing Co.* v. *Shawmut Corp.* 245 Mass. 106, was an action for conversion brought by a holder of a trust receipt against an innocent pledgee for value where the trust instrument gave to one in possession general authority to sell.

*T. D. Downing Co.* v. *Shawmut Corp., supra,* cited and relied on by the plaintiff, is not at variance with what is here decided. The factors act was not applicable to that case, and no reference was made to it either on the briefs or in the opinion; nor were the rights of a pledgee involved. It was an action to recover certain duties paid by a custom house broker and expenses and commissions due it. The defendant was a banking corporation which financed the importation of goods at the request of the importer. The trust receipt provided that the importer should hold "said goods in trust" for certain purposes; the goods were in a bonded warehouse and there held subject to the payment of importation duties. The plaintiff contended that the importer was the agent of the defendant as undisclosed principal, and as such the latter was liable. The defendant had no interest in getting the goods out of the warehouse, and the payment of duties was no part of the contract between the defendant and the importer. It was held that the importer was in no sense the agent of the defendant and that the latter was not liable. It is plain that the decision in that case has no relevancy to the facts in the case at bar. Under the factors act (G. L. c. 104, § 3) the defendant as a *bona fide* pledgee for value took from Graves a right superior to the title of the holder of the trust receipt.

The defendant's seventh and eighth requests are as follows:

"7. The plaintiff having allowed Graves to take and retain possession of the wool and to hold himself out as the owner thereof, it cannot in equity and good conscience claim that the said Graves had no right to pledge the yarn to the defendant to secure this loan.

"8. Even if said plaintiff ever acquired title to said yarn, nevertheless it having clothed said Graves with the indicia of ownership, the defendant, being in the position of a *bona fide* purchaser for value, cannot be held to have converted said yarn as alleged by the plaintiff."

These requests were applicable in view of the entire evidence, although no specific reference was made to G. L. c. 104, § 3. *Parrot* v. *Mexican Central Railway,* 207 Mass. 184, 190;

and the exceptions of the defendant to the refusal of the trial judge to give them must be sustained.

In view of the conclusion reached, it is not necessary to determine whether the action can be maintained for the reason that after it was brought the plaintiff transferred its assets to the International National Bank of Boston which was then merged and consolidated with The First National Bank of Boston. G. L. c. 172, § 44, as amended by St. 1922, c. 292. See *Commonwealth-Atlantic National Bank of Boston, petitioner*, 249 Mass. 440, 443, 444.

As the defendant's seventh and eighth requests should have been given, it is unnecessary to consider the remaining exceptions.

*Exceptions sustained.*